UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOVERNMENT APP SOLUTIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, et al.,<br><br>Defendants. | No. 2:21-cv-00696-TLN-KJN<br><br>**ORDER** |

This matter is before the Court on Defendants Eric Garcetti ("Garcetti"), Kevin Johnson ("Johnson"), Toni Harp ("Harp"), Gregory J. Stanton ("Stanton"), the City of New Haven ("New Haven"), Andrea Scott ("Scott"), Daryl Jones ("Jones"), Casey Lund ("Lund"), Nicole West ("West"), Michael Tubbs ("Tubbs"), and Daniel Lopez's ("Lopez") (collectively, "Defendants") Motions to Dismiss. (ECF Nos. 34, 58, 60, 61, 62, 63, 64, 110, 112, 120.) Plaintiff Government App Solutions, Inc. ("Plaintiff") filed oppositions. (ECF Nos. 40, 43, 79, 83, 86, 87, 88, 89, 113, 116, 121.) Defendants filed replies. (ECF Nos. 45, 90, 91, 92, 93.) For the reasons set forth below, Garcetti, Johnson, Harp, Stanton, New Haven, Scott, Jones, West, and Tubbs and Lopez's motions (ECF Nos. 34, 58, 60, 61, 62, 63, 64, 112, 120) are GRANTED with leave to amend and Lund's motion is DENIED (ECF No. 110).

///

### I. FACTUAL AND PROCEDURAL BACKGROUND[1]

The instant case arises from the Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office for the Eastern District of California's ("U.S. Attorney's Office") alleged use of Plaintiff's company in public corruption sting operations. (*See* ECF No. 6.) Plaintiff is a business that provides a crowdsourcing platform with software and technical support to municipalities through the United States to increase road safety, to reduce distracted driving incidents, to issue and collect parking citations, and to generally improve community living conditions. (*Id.* at 6–7.) In January 2018, Plaintiff entered into an oral contract wherein Derek L. Bluford ("Bluford") would communicate with and obtain contracts with municipalities using Plaintiff's platform and services and in return Plaintiff would compensate Bluford depending on the size of the contract. (*Id.* at 7.) On July 1, 2018, Bluford entered into a written "Consulting Agreement" with Johnson to market Plaintiff's services to include the cities of Los Angeles, California, Phoenix, Arizona, and New Haven, Connecticut. (*Id.*) Under the Consulting Agreement, Johnson would receive 17%, 10%, and 10% of all current and future net revenues from Plaintiff's contracts with Los Angeles, Phoenix, and New Haven, respectively. (*Id.* at 7–8.) On July 31, 2018, however, the Consulting Agreement was amended to provide Johnson with up to 20% equity ownership in Plaintiff in lieu of the original revenue sharing arrangement. (*Id.* at 8.) Plaintiff alleges at the time it entered into and amended the Consulting Agreement, Johnson had the intention to willingly, knowingly, and illegally bribe the mayors of those cities in order to obtain contracts for Plaintiff. (*Id.*) Plaintiff alleges it was never aware of Johnson's bribery scheme when it was being implemented, but rather only became aware of it when Bluford published a book in October 2020. (*Id.*)

On January 11, 2018, the U.S. Attorney's Office issued a criminal indictment against Bluford for wire fraud and monetary transactions involving criminally derived funds. (*Id.*) In October 2018, Bluford and the U.S. Attorney's Office began to explore ways for Bluford to assist in the investigation of public corruption, and Bluford then became a Confidential Human Source

---

[1]  The factual and procedural background is taken, at times verbatim, from Plaintiff's First Amended Complaint ("FAC"). (ECF No. 6.)

2

("CHS") for the FBI. (*Id.*) Bluford acted as the FBI's point man in conducting sting operations in which Bluford was instructed to offer and deliver bribes to mayors and municipal employees in return for securing contracts for Plaintiff's services. (*Id.* at 8–9.) Plaintiff alleges neither the FBI nor the U.S. Attorney's Office ever at any time informed Plaintiff that Plaintiff would be used as the company on behalf of whom the bribes would be offered in the sting operations, and neither the FBI nor the U.S. Attorney's Office ever obtained Plaintiff's consent to be used in these operations. (*Id.* at 9.) Plaintiff only learned of these operations when Bluford published his book. (*Id.*) Plaintiff alleges that Bluford was granted complete civil and criminal immunity by the U.S. Attorney's Office to operate as a CHS on behalf of the FBI, and therefore Bluford has complete immunity with respect to his conduct and Plaintiff's claims. (*Id.*) Plaintiff filed a lawsuit against only Bluford in El Dorado County Superior Court (the "El Dorado case") and through discovery learned of Bluford's undercover work. (*Id.*)

In February 2020, the FBI informed Plaintiff that its contract with New Haven had not been obtained in "good faith," but did not explain why or that it had used Plaintiff in the sting operations. (*Id.* at 10.) Plaintiff alleges that as a CHS for the FBI, Bluford delivered cash bribes or arranged for online payments to the city officials, all disguised as contributions to the city official's reelection campaign. (*Id.*) Plaintiff further alleges Harp and Stanton received these bribes, and Tubbs agreed to receive a bribe but Bluford's role as a CHS terminated before the bribe could be delivered. (*Id.*) Pursuant to the Consulting Agreement, Johnson received a percentage of the money generated by Plaintiff's contract with the municipality whose public official had been bribed in return for sometimes providing money but always arranging the meetings and making the deals for the bribes. (*Id.* at 10–11.)

Plaintiff alleges the bribery schemes and four illegal association-in-fact enterprises affected interstate commerce, as the bribes and conspiracy to bribe took place in California, Arizona, and Connecticut. (*Id.* at 11–12.) Plaintiff further alleges there was a pattern of racketeering by Johnson, West, and Bluford in their four illegal bribery enterprises. (*Id.* at 12.) Plaintiff finally alleges it sustained damages and injury to its business and property. (*Id.*)

///

On April 18, 2021, Plaintiff filed the instant action in this Court.  (ECF No. 1.)  On April 29, 2021, Plaintiff filed the FAC.  (ECF No. 6.)

**II.    STANDARD OF LAW**

　　A.　　Motion to Dismiss for Failure to State a Claim

A motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief."  *Twombly*, 550 U.S. at 570.

Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations."  *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume the plaintiff "can prove

facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 680. While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In ruling on a motion to dismiss, a court may only consider the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)).

B.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

A party may bring a motion to challenge a court's subject matter jurisdiction under Rule 12(b)(1). *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). The objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). The challenge can be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

"When subject matter jurisdiction is challenged under Federal Rule of [Civil] Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion."

*Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001), *abrogated on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010)). "'Unless the jurisdictional issue is inextricable from the merits of a case, the court may determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1)[.]'" *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) (internal citations omitted). "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Community v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004). If the court determines at any time that it lacks subject matter jurisdiction, "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### III.  ANALYSIS[2]

Plaintiff's FAC alleges: (1) violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act §§ 1962(c) and (d) against Johnson, West, Harp, Scott, and Jones; (2) violations of RICO §§ 1962(c) and (d) against Johnson, West, and Stanton; (3) violations of RICO §§ 1962(c) and (d) against Johnson, West, and Garcetti; (4) violations of RICO §§ 1962(c) and (d) against Johnson, West, Tubbs, and Lopez; (5) violations of Plaintiff's due process rights; (6) negligence; (7) breach of contract against Johnson; (8) breach of contract against New Haven; (9) fraud against Lund; (10) theft against Lund; and (11) negligence. (ECF No. 6 at 52–57.) The Court will first address Plaintiff's RICO claims and then the remaining claims in turn.[3]

---

[2]  The Court also notes as a preliminary matter that Plaintiff's initial oppositions were stricken from the docket because they exceeded the allotted page limit. (*See* ECF Nos. 73, 75, 77, 81.) The newer-filed oppositions are identical in text to the previously filed oppositions but the line spacing has been decreased from double spaced so that all the previous text can fit within the allotted page limit. Pursuant to Local Rule 130, all documents submitted to the Court must be double spaced. E.D. Cal. L.R. 130(c). The Court finds that these newer-filed oppositions have been submitted in bad faith and is inclined to strike them from the docket as well. However, the Eastern District of California has one of the highest caseloads in the United States and doing so would not make sense when considering judicial efficiency. The Court accordingly admonishes counsel for submitting briefs in such blatant violation of the Court's rules and the Local Rules. Should counsel ever violate these rules in the future, the Court will either strike the briefing and decline to consider it, or stop reading after it reaches the page limit.

[3]  Claims Five, Six, Nine, Ten, and Eleven are asserted against other Defendants who are not parties to the instant motions to dismiss, and thus the Court has omitted their names and will not address said claims herein.

6

1              A.      Claims One through Four: Violations of RICO[4]

2       The RICO Defendants argue Plaintiff has no standing to assert a RICO claim.[5]  (*See* ECF

Nos. 34, 58, 60-1, 61, 63, 64-1, 112, 120.)  Generally, they argue the targeted municipalities were the "direct victims" of the alleged bribery schemes and Plaintiff was actually an intended beneficiary of these schemes — not a victim.  (ECF No. 34 at 15; ECF No. 58 at 15; ECF No. 60-1 at 15; ECF No. 61 at 12; ECF No. 63 at 15; ECF No. 64-1 at 14; ECF No. 112 at 5; ECF No. 120 at 12 (citing *Anza v. Ideal Steel Corp.*, 547 U.S. 451, 461 (2006); *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010)).)  They contend that Plaintiff's alleged harm — namely, loss of business opportunities with other municipalities due to the disclosures in Bluford's book about the alleged bribery schemes — is too attenuated and indirect.  (ECF No. 34 at 16; ECF No. 58 at 16–17; ECF No. 60-1 at 17; ECF No. 61 at 12–13; ECF No. 63 at 17–18; ECF No. 64-1 at 16–17; ECF No. 112 at 6–7; ECF No. 120 at 12.)  They further note that the discovery or public disclosure of the alleged bribery schemes is a derivative harm based on the original harm to the cities targeted by the schemes.  (ECF No. 34 at 16; ECF No. 58 at 16; ECF No. 60-1 at 17; ECF No. 61 at 13; ECF No. 63 at 19–20; ECF No. 64-1 at 17–18; ECF No. 112 at 6–7; ECF No. 120 at 12.)

       In opposition,[6] Plaintiff generally argues that in none of the cases cited by the RICO Defendants did a RICO defendant cause a RICO claimant to become directly involved in criminal activity, which is a harm in and of itself.  (ECF No. 69 at 12; ECF No. 86 at 10, 12; ECF No. 87 at 10; ECF No. 88 at 10; ECF No. 89 at 10; ECF No. 116 at 8–10; ECF No. 121 at 11, 17.)

---

[4] Because Garcetti, Johnson, Harp, Stanton, Scott, Jones, West, Tubbs and Lopez (the "RICO Defendants") make overlapping arguments as to Counts One through Four, the Court will address them together.

[5] The RICO Defendants also argue that these claims fail as a matter of law (*see* ECF Nos. 34, 58, 60-1, 61, 63, 64-1, 112, 120), which the Court declines to address because it finds Plaintiff does not have standing.

[6] Plaintiff also seeks in its opposition to disqualify the Los Angeles City Attorney's Office as the counsel representing Garcetti in this action.  (ECF No. 40 at 7–11.)  The Court declines to rule on this request as Plaintiff is required to file a separate motion to disqualify counsel and not raise it in its opposition to the pending motion to dismiss.

7

1    Plaintiff further asserts that it was foreseeable that the bribery scheme could be exposed and cause
2    it harm.  (ECF No. 40 at 14; ECF No. 69 at 15; ECF No. 86 at 15; ECF No. 87 at 14; ECF No. 88
3    at 14; ECF No. 89 at 14; ECF No. 116 at 13; ECF No. 121 at 16.)  Plaintiff notes the facts of
4    *Anza* and *Hemi* are inapplicable to the instant case.  (ECF No. 40 at 12; ECF No. 69 at 13, 16;
5    ECF No. 86 at 11–12, 15; ECF No. 87 at 11–12, 15; ECF No. 88 at 11, 15; ECF No. 89 at 10–11,
6    15; ECF No. 116 at 9–10, 15; ECF No. 121 at 12, 17–18.)  Plaintiff finally seeks leave to amend
7    should the Court find deficiencies in his FAC.  (ECF No. 40 at 20; ECF No. 43 at 6; ECF No. 69
8    at 24; ECF No. 87 at 23; ECF No. 86 at 23; ECF No. 88 at 23; ECF No. 89 at 21; ECF No. 116 at
9    18; ECF No. 121 at 23.)

10          Not all of the RICO Defendants filed replies, but most of those that did argue Plaintiff is
11   not a direct victim based on its own allegations presented in the FAC and therefore cannot
12   recover under RICO.  (ECF No. 45 at 4; ECF No. 91 at 5; ECF No. 93 at 3–4.)  Specifically, they
13   note that if the alleged bribery scheme had not been exposed, then Plaintiff would not have
14   suffered any injury.  (*Id.*)  A number of the RICO Defendants also assert that merely involving a
15   plaintiff in criminal activity does not give that plaintiff standing to assert a RICO claim.  (ECF
16   No. 45 at 3; ECF No. 91 at 5; ECF No. 93 at 2–3 (citing *In re American Express Co. Shareholder*
17   *Litig.*, 39 F.3d 395 (2d Cir. 1994)).)

18          RICO provides that "[a]ny person injured in his business or property by reason of a
19   violation of [§] 1962 of this chapter may sue therefor in any appropriate United States district
20   court and shall recover threefold the damages he sustains and the cost of the suit, including a
21   reasonable attorney's fee . . . ."  18 U.S.C. § 1964(c).  "To have standing under § 1964(c), a civil
22   RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property;
23   and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to
24   establish proximate causation."  *Canyon Cnty. v. Syngenta Seeds*, 519 F.3d 969, 972 (9th Cir.
25   2008) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Sedima, S.P.R.L. v.*
26   *Imrex Co.*, 473 U.S. 479, 496 (1985)).  The "central question" a district court must ask when
27   evaluating proximate causation "is whether the alleged violation led directly to the plaintiff's
28   injuries."  *Anza*, 547 U.S. at 461; *see also Holmes* 503 U.S. at 268 (proximate cause is "a demand

for some direct relation between the injury asserted and the injurious conduct alleged"). "A link that is 'too remote,' 'purely contingent, or 'indirec[t]' is insufficient." *Hemi Group, LLC*, at 559 U.S. at 9.

In the instant case, pursuant to the relevant case law set forth by the RICO Defendants, the Court finds Plaintiff cannot establish proximate causation. First, in *Anza*, Ideal Steel Supply Corporation sued National Steel Supply, Inc. alleging it "engaged in an unlawful racketeering scheme" in its sale of steel mill products by not charging the required New York sales tax, thereby allowing it "to reduce its prices without affecting its profit margin." 547 U.S. at 454. Applying its precedent in *Holmes* — that there must be a "demand for some direct relation between the injury asserted and the injurious conduct alleged" — the Supreme Court found Ideal could not maintain its claim because "[t]he direct victim of this conduct was the State of New York, not Ideal." *Id.* at 457–58 (citing *Holmes*, 503 U.S. at 259). Ideal's theory of causation was that National "harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers." *Id.* The Supreme Court found that "[i]t was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. The Supreme Court noted the directness requirement is intended to prevent the difficulty when courts try to calculate damages "by some remote action." *Id.* The Supreme Court explained "[t]he adjudication of the State's claims . . . would be relatively straightforward; while it may be difficult to determine facts such as the number of sales Ideal lost due to National's tax practices, it is considerably easier to make the initial calculation of how much tax revenue [National] withheld from the State." *Id.* at 459–60.

Second, in *Hemi*, the City of New York sued Hemi Group, LLC, a company that sells cigarettes online, for failure to file Jenkins Act information with the State of New York, which requires out-of-state cigarette sellers to register and file a report listing the contact information and quantity of cigarettes purchased by in-state residents. *Hemi Group, LLC*, 559 U.S. at 5–6. The City levied a $1.50 per pack tax on cigarettes and required in-state sellers to charge, collect, and remit the tax. *Id.* at 5. For out-of-state sellers, the City and the State have an agreement in which the State forwards Jenkins Act information to the City so the City can collect back taxes.

*Id.* The City alleged Hemi's interstate sale of cigarettes and failure to file Jenkins Act reports were RICO predicate offenses of mail and wire fraud. *Id.* at 7. In discussing the City's causal theory, the Supreme Court found that it was "far more attenuated" than ones it has previously rejected. *Id.* at 9. Noting that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step" of the theory of causation and that the Supreme Court's cases "confirm that the 'general tendency' applies with full force to proximate cause inquiries under RICO," the Supreme Court concluded "the City's theory of causation require[d] [it] to move well beyond the first step." *Id.* at 10 (citing *Holmes*, 503 U.S. at 271–72). The Supreme Court noted "[t]he City's claim suffer[ed] from the same defect as the claim in *Anza*," as the City's theory required it to "extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)." *Id.* at 11. The Supreme Court concluded that "Hemi's obligation was to file the Jenkins Act reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi." *Id.*

Similarly in the instant case, Plaintiff's theory of causation is too indirect. Plaintiff alleges in the Complaint there were four association-in-fact enterprises engaged in bribery schemes to secure a city contract for Plaintiff and "Plaintiff only became aware of the [bribery] sting operations when Bluford published . . . *The Mighty Have Fallen*." (*See* ECF No. 6 ¶¶ 28, 32–33.) Plaintiff alleges it has been injured in its business and property, stating:

> Plaintiff has lost all value as a viable company due to the bribery scheme . . . in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 [m]illion [d]ollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero.

(*Id.* at ¶¶ 45, 56, 67.) Plaintiff also asserts that it expended substantial amounts of money to develop the platforms specifically for the cities of New Haven, Phoenix, and Los Angeles, and Plaintiff has not been reimbursed. (*Id.*) Based on the foregoing, Plaintiff's theory of causation is as follows: four association-in-fact enterprises engaged in bribery schemes to secure contracts for Plaintiff, these schemes were disclosed to the public, upon disclosure Plaintiff's value

plummeted, and Plaintiff has still not been reimbursed for the services provided pursuant to these contracts. According to this theory pleaded in the Complaint, Plaintiff was directly harmed by the *public exposure* of the bribery schemes and therefore only indirectly from the bribery schemes themselves.[7] The Court also agrees with the RICO Defendants' assertion that the *direct* victims of the alleged bribery schemes were the actual municipalities themselves. Therefore, the Court finds Plaintiff's theory of causation is too indirect and declines to "go beyond the first step" of the theory of causation. *Hemi Group, LLC*, 559 U.S. at 10. Further, the Court notes that Plaintiff will also likely have a difficult time in calculating damages. There could have been any number of reasons unconnected to the alleged bribery schemes for which Plaintiff's value dropped, as "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [Plaintiff's drop in value was] the product of [the schemes]." *Anza*, 547 U.S. at 459. Finally, to the extent Plaintiff argues involvement in criminal conduct was a harm it suffered in and of itself, Plaintiff does not allege any facts to support this theory of harm in its Complaint, nor does it provide any case law in its opposition to provide support either. (*See* ECF Nos. 6, 40, 43, 59, 86, 87, 88, 89, 116, 121.)

At this juncture, however, the Court cannot say with certainty "that the pleading could not possibly be cured by the allegation of other facts." *Lopez*, 203 F.3d at 1130. Accordingly, the RICO Defendants' Motion to Dismiss Claims One through Four is GRANTED with leave to amend.

### B.    Claim Seven: Breach of Contract against Johnson

Johnson argues Plaintiff's FAC does not state a breach of the Consulting Agreement entered into in January 2018 or the Shareholder Protection Agreement (the "Agreement") fully executed on January 24, 2020, but rather only refers to the conduct in Claims One through Four (e.g., "engaging in bribery schemes[,] . . . conducting four association-in-fact enterprises through

---

[7]    Plaintiff argues in his opposition that "[p]ublic policy dictates that the publishing of a book is constitutionally protected activity and cannot be found to be the proximate cause of Plaintiff's damages." (ECF No. 86 at 13; ECF No. 87 at 13; ECF No. 88 at 13; ECF No. 89 at 13; ECF No. 116 at 12; ECF No. 121 at 15.) The Court does not find this argument persuasive because Plaintiff provides no authority for this assertion.

1 a pattern of racketeering activity for the unlawful purpose of conducting business through bribes,
2 conspiracy to bribe, wire fraud, and mail fraud . . . ."), which predates the Agreement. (ECF No.
3 58 at 23–24.) Johnson notes that even if such allegations fell within some previous agreement,
4 "the FAC on its face demonstrates that the breach and harm alleged arise, if at all, from Bluford's
5 2020 publication of information that Plaintiff was part of a sting operation." (*Id.* at 24.) Johnson
6 further argues the claim fails because the FAC fails to allege any new consideration for any
7 agreement not to diminish Plaintiff's value as "Johnson's alleged acts in breach of contract, and
8 those of Plaintiff's own agent Bluford, occurred before the Agreement was executed, and the only
9 pleaded cause of Plaintiff's value 'plummeting to zero' were Bluford's later acts." (*Id.* at 24–25.)
10     In opposition, Plaintiff asserts the FAC alleges Johnson was engaging in racketeering
11 activity on February 6, 2020, after he executed the Agreement on December 31, 2019, and after
12 Plaintiff executed the Agreement on January 24, 2020. (ECF No. 89 at 22.) Plaintiff contends
13 with respect to a lack of consideration, the Agreement itself states the consideration — namely,
14 "the consideration for . . . Johnson and the other Shareholders to enter into the Agreement . . . was
15 the protection of the Shareholder's shares." (*Id.* at 22–23.) Finally, Plaintiff maintains Johnson's
16 contention that the cause of Plaintiff's damages and the loss of Plaintiff's value was Bluford's
17 publication of his book cannot stand because "the rightful exercise of the constitutional rights to
18 freedom of speech can never been the proximate cause of damages as a matter of public policy."
19 (*Id.* at 12.)
20     To sustain a claim for breach of contract, a plaintiff must allege: (1) the existence of a
21 contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and
22 (4) resulting damage to plaintiff. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).
23 The Court will address the first, second, and fourth elements and then address the disputed third
24 element.
25     In the instant case, with respect to the first element, Plaintiff alleges "[o]n December 31,
26 2019[,] Defendant Johnson and Plaintiff entered into an agreement entitled 'Shareholder
27 Protection Agreement,'" which contained numerous provisions setting forth that both the
28 Company and Shareholder have mutual responsibilities to refrain from action or conduct "that

would directly or indirectly cause or result in the Company's value being diminished, or that would directly or indirectly cause any monetary or any other damages to the Company." (ECF No. 6 at 40.) With respect to the second element, Plaintiff alleges it "has performed all the conditions, covenants, and promises required on Plaintiff's part to be performed in accordance with the terms and conditions of the Shareholder Protection Agreement with Defendant Johnson." (*Id.*) The Court finds it is a close call as to whether the facts supporting the second element are conclusory or enough to be plausible. With respect to the fourth element, Plaintiff alleges that "[a]s a proximate and direct result of Defendant Johnson's breach . . . Plaintiff has lost all value as a viable company, in that no municipality in the United States will do business with a company that was involved in offering and giving bribes to public officials to secure city contracts." (*Id.*)

With respect to the third element, Plaintiff alleges "[o]n various dates as described [in paragraphs 26 through 78], and all within the past four years, Defendant Johnson has breached the Shareholder Agreement by engaging in bribery schemes and conducting four association-in-fact enterprises through a pattern of racketeering activity." (*Id.* at 40.) Paragraphs 26 through 78 set forth some background facts, but are mostly the allegations supporting Plaintiff's RICO claims. (*Id.* at 7–30.) The paragraphs setting forth background facts do not contain dates, but the paragraphs specifically referencing Johnson's conduct state that "in or about the first few months of 2018, Defendant Stanton accepted a bribe in the amount of $15,000 that was paid to him by Defendant Johnson." (*Id.* at 18.) The only other date that references Johnson's role in this bribery scheme is April 30, 2018. (*Id.* at 19.) Plaintiff alleges, therefore, that these acts took place prior to the execution of the Agreement. The only agreement that Plaintiff alleges was executed prior to this conduct is the Consulting Agreement entered into on July 1, 2018 (*id.* at 9), but that is not the contract Plaintiff has identified as the contract that has been breached. The Court therefore finds Plaintiff has not provided sufficient factual allegations to establish that Johnson breached the Agreement *after* its execution.

Accordingly, Johnson's Motion to Dismiss Claim Seven is GRANTED with leave to amend.

///

C.     Claim Eight: Breach of Contract against New Haven

New Haven argues the Court does not have jurisdiction over this state law claim because Plaintiff's breach of contract claim "presents an issue of purely state law and is based on a vastly different set of allegations than those underlying the claims against the codefendants."[8] (ECF No. 62 at 9.) New Haven notes Plaintiff's asserted basis for jurisdiction is 28 U.S.C. § 1331, or federal question jurisdiction, and this pendent state law claim does not share a "common nucleus of operative fact" necessary for supplemental jurisdiction under 28 U.S.C. § 1367. (*Id.* (citing *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).) Namely, New Haven asserts "[t]he substantive allegations of RICO violations against the codefendants occurred prior to the execution of the contract on December 30, 2019," and "the operative facts in the breach of contract claim would be limited to the express terms of the contract, the performance by each contracting party, and the contract's termination." (*Id.* at 9–10.) New Haven finally notes that Plaintiff has not alleged any basis for jurisdiction over New Haven other than 28 U.S.C. § 1331. (*Id.* at 10.)

In opposition, Plaintiff asserts the breach of contract claim and its other RICO claims should be tried together "as the claims are very closely related and there is a substantial risk of inconsistent verdicts should the claims be tried separately." (ECF No. 83 at 6–7.) Plaintiff notes the FAC sets forth the following RICO allegations referencing the contract at issue for which Plaintiff has sued New Haven: ". . . . Defendant Harp also received cash and on-line donations as bribes in the amount of $25,000, all in return for the City of New Haven granting a contract to Plaintiff for Plaintiff's services . . . After the bribes were paid, the City of New Haven did enter into a contract with Plaintiff for Plaintiff's services." (*Id.* at 7 (quoting ECF No. 6 ¶ 39(a)).) Plaintiff also notes that in its prayer for relief in the FAC, it "seeks the same $150,000 from the RICO Defendants as it does from New Haven — that in itself shows the close relatedness of the claims." (*Id.* at 7–8 (quoting ECF No. 6 at 52, 56).) Plaintiff finally notes that "New Haven has

---

[8] New Haven also moves to dismiss for lack of personal jurisdiction and improper venue. (ECF No. 62 at 10–14.) Because the Court finds that it does not have subject matter jurisdiction over this claim, it will address New Haven's motion to dismiss for lack of subject matter jurisdiction argument alone.

14

1  an ethical obligation and duty to its constituents to seek indemnification from the RICO
2  Defendants in the event New Haven is found to be liable to Plaintiff for the $150,000." (*Id.* at 9.)
3        28 U.S.C. § 1367(a) provides: "[I]n any civil action of which the district courts have
4  original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims
5  that are so related to claims in the action within such jurisdiction that they form part of the same
6  case or controversy under Article III of the United States Constitution." "A state law claim is part
7  of the same case or controversy when it shares a 'common nucleus of operative fact' with the
8  federal claims and the state and federal claims would normally be tried together." *Bahrampour*,
9  356 F.3d at 978. Therefore, a district court may exercise supplemental jurisdiction over a state
10 law claim when: "(1) the complaint asserts a valid claim arising under federal law; (2) the
11 complaint asserts a claim arising under state law which shares 'a common nucleus of operative
12 facts' with the federal claim; and (3) the state law claim is such that a plaintiff would ordinarily
13 be expected to try them all in a single judicial proceeding." *Grid Sys. Corp. v. Tex. Instruments*
14 *Inc.*, 771 F. Supp. 1033, 1043 (N.D. Cal. 1991) (internal quotation marks and citation omitted).
15       In the instant case, the Court finds the question of whether to extend supplemental
16 jurisdiction over this breach of contract claim to be a close call. Plaintiff is indeed correct that the
17 contract at issue was implicated in the alleged RICO bribery schemes and, as a result, Plaintiff
18 seeks the same $150,000 from the RICO Defendants as it does from New Haven. Ultimately,
19 however, the operative facts that give rise to Plaintiff's breach of contract claim is New Haven's
20 alleged failure to pay the amount due under the contract — not any of the alleged RICO
21 violations. Therefore, this claim can be tried separately from the RICO claims. The Court also
22 agrees with New Haven that Plaintiff does not support with any law its arguments regarding the
23 specter of inconsistent findings that could subject New Haven to liability and New Haven's
24 "ethical obligation" to pursue its own claim against the RICO Defendants. (ECF No. 90 at 3.)
25 New Haven also points to an analogous district court case in which the court declined to extend
26 supplemental jurisdiction over a state law claim seeking declaratory relief over the meaning and
27 effect of a licensing agreement, finding that it did not share a common nucleus of operative facts
28 with the plaintiffs' federal claims arising primarily from allegations of fraud in defendant's patent

1  acquisition. *See Grid Sys. Corp.*, 711 F. Supp. at 1043. The same logic applies here.

2  Plaintiff requests leave to amend to assert diversity jurisdiction as the statutory basis for
3  its breach of contract claim. (ECF No. 83 at 5–6.) In light of the fact that there appears to be
4  multiple Defendants in this case who are citizens of California, the Court finds that it is highly
5  unlikely that Plaintiff will be able to establish diversity jurisdiction in this case. Further, while
6  there are some exceptions to complete diversity (*i.e.*, the Class Action Fairness Act and statutory
7  interpleader), the Court finds that those exceptions do not apply in this case. However, in an
8  abundance of caution — and because Plaintiff specifically requests leave to amend to assert
9  diversity jurisdiction — New Haven's Motion to Dismiss Claim Eight is GRANTED with leave
10 to amend.

                D.       Claims Nine and Ten: Fraud and Theft against Lund

Lund argues he has immunity from Plaintiff's suit and that Plaintiff's claim is barred by its own participation in an illegal activity. (ECF No. 111 at 7–9.) The Court will consider each argument in turn.

                         *i.     Immunity*

Lund argues that pursuant to *Filarsky v. Delia*, 556 U.S. 377, 390–91 (2012), he has immunity as "a private individual conducting public work on behalf of the government." (ECF No. 111 at 7–8.) Lund notes the identical charges against FBI Special Agent Rebekah Bills were dismissed based on qualified immunity, and that same immunity extends to his conduct. (*Id.* at 8.) In opposition, Plaintiff asserts qualified immunity "has no applicability whatsoever to any state tort claims" and the cases Lund cites in his motion all relate to qualified immunity for federal tort claims. (ECF No. 113 at 3–4 (citing *Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009)).) Plaintiff further asserts California Government Code § 822.2 does not provide such immunity either because he has been accused of actual fraud in the FAC. (*Id.* at 4.)

In the instant case, the claims Plaintiff asserts against Lund are state law claims. A review of *Filarsky* reveals the Supreme Court extends qualified immunity for private individuals hired by municipalities to 42 U.S.C. § 1983 claims only. 566 U.S. at 393–94. Lund does not provide any other case law upon which to base his assertion that he has immunity from Plaintiff's fraud and

16

theft claims. Accordingly, Lund's Motion to Dismiss Claims Nine and Ten on this basis is DENIED.

### ii. Participation in an Illegal Activity

Lund argues that "[f]ederal courts refuse to exercise jurisdiction to enforce the consequences of an illegal transaction" and Plaintiff benefited from Bluford's allegedly illegal activities, "both in the individual contracts he obtained and the resulting increase in [Plaintiff's] proprietary interest in its products and services." (ECF No. 111 at 9 (citing *Kaiser Steel v. Mullins*, 455 U.S. 72, 77–83 (1982); *McMullen v. Hoffman*, 174 U.S. 639, 669 (1899)).) Lund contends that allowing Plaintiff's claims to proceed "restores to it the profits and reputational gains it achieved by virtue of the illegal bribery scheme." (*Id.*) In opposition, Plaintiff maintains the assertion that it participated in illegal activity is false and "the FAC never alleges that Bluford was Plaintiff's employee." (ECF No. 113 at 4–5.) Plaintiff asserts the FAC "makes it very clear that Plaintiff had no knowledge of the bribery schemes and of Bluford's activities as the undercover agent of the FBI, and Plaintiff only became aware of Bluford's undercover activities when Bluford published a book." (*Id.* at 5 (citing ECF No. 6 ¶ 26).) Plaintiff notes nothing in the FAC alleges it became the focus of an FBI investigation. (*Id.*)

The Supreme Court in *Kaiser Steel* reaffirmed the rule articulated in *McMullen* that "illegal promises will not be enforced in cases controlled by the federal law." 455 U.S at 77 (citing *McMullen*, 174 U.S. 639). In *McMullen*, the Supreme Court found an agreement between two bidders for public work illegal and rejected one of the parties' suit to enforce it. 174 U.S. at 668–70. The two bidders submitted separate bids and did not disclose they agreed to share the work equally if one of them received the contract, and the Supreme Court noted that "to permit recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand." *Id.* at 669. Similarly, in *Kaiser Steel*, the Supreme Court found that if a specific clause in a collective bargaining agreement was illegal under the antitrust or labor laws, to order the coal producer to pay "would command conduct that assertedly renders the promise an illegal undertaking under the federal statutes." 455 U.S. at 79–80.

The Court finds Lund's citation to *Kaiser Steel* and *McMullen* to be inapposite because the instant case does not deal with the enforcement of an allegedly illegal agreement or promise. Lund argues that Plaintiff participated in illegal activity in the alleged bribery schemes. However, the Court agrees with Plaintiff that nowhere in the FAC does Plaintiff allege that it actually participated in these schemes.[9] Accordingly, Lund's Motion to Dismiss Claims Nine and Ten on this basis is DENIED.

### IV.   CONCLUSION

Based on the foregoing, the Court hereby GRANTS in part and DENIES in part the following motions to dismiss as follows:

1. Garcetti's Motion to Dismiss (ECF No. 34), Johnson's Motion to Dismiss (ECF No. 58), Harp's Motion to Dismiss (ECF No. 60), Stanton's Motion to Dismiss (ECF No. 61), New Haven's Motion to Dismiss (ECF No. 62), Scott's Motion to Dismiss (ECF No. 63), Jones's Motion to Dismiss (ECF No. 64), West's Motion to Dismiss (ECF No. 112), and Tubbs and Lopez's Motion to Dismiss (ECF No. 120) are GRANTED with leave to amend; and

2. Lund's Motion to Dismiss (ECF No. 110) is DENIED.

Plaintiff may file an amended complaint within thirty (30) days of the electronic filing date of this Order. Defendants have twenty-one (21) days of the electronic filing date of the amended complaint to file a responsive pleading.

IT IS SO ORDERED.

**DATED: AUGUST 9, 2022**

Troy L. Nunley
United States District Judge

---

[9] Stanton also argues in his motion to dismiss that Plaintiff's RICO claim is barred based on its implication in an illegal bribery scheme. (ECF No. 61 at 9–11.) For the same reasons that are stated herein, this argument fails.

18