CYRUS ZAL, SBN: 102415
CYRUS ZAL, A PROFESSIONAL CORPORATION
102 Mainsail Court
Folsom, CA 95630
Telephone: (916) 220-4315
Fax: (916) 985-4893
Email: czal47@comcast.net

Attorney for Plaintiff GOVERNMENT APP SOLUTIONS, INC., a California corporation

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOVERNMENT APP SOLUTIONS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE FEDERAL BUREAU OF INVESTIGATION, THE UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF CALIFORNIA, MICHAEL ANDERSON, AMY S. HITCHCOCK, REBEKAH BILLS, RACHEL LACHAPELLE, CITY OF NEW HAVEN, KEVIN JOHNSON, NICOLE WEST, TONI HARP, DARYL JONES, ANDREA SCOTT, MICHAEL TUBBS, DANIEL LOPEZ, ERIC GARCETTI, GREGORY J. STANTON, CASEY LUND,<br>and DOES 1-999,<br><br>Defendants. | Case No. 2:21-cv-00696-DAD-KJN<br><br>SECOND AMENDED COMPLAINT OF PLAINTIFF GOVERNMENT APP SOLUTIONS, INC. FOR DAMAGES FOR:<br><br>**1. VIOLATIONS OF THE FEDERAL RACKEETER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [18 U.S. CODE §1964];**<br><br>**2. NEGLIGENCE;**<br><br>**3. BREACH OF CONTRACT;**<br><br>**4. FRAUD; and**<br><br>**5. THEFT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff GOVERNMENT APP SOLUTIONS, INC. ("Plaintiff") for its First Amended Complaint against defendants alleges as follows and demands trial by jury:

1.   **JURISDICTION.**  Plaintiff brings this action pursuant to 18 U.S.C. §1962 and §1964 for treble damages, and to redress the violations by certain of the named Defendants of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Jurisdiction is conferred on this Court by 18 U.S.C. §1964(c), which provides for original jurisdiction in this Court of all suits brought pursuant to 18 U.S.C. §1962. Jurisdiction is also conferred by 28 U.S.C. § 1331 because claims for relief herein derive from the laws of the United States.

2.   **INTRADISTRICT ASSIGNMENT.**  Venue properly lies in the Eastern District of California, pursuant to 28 U.S.C. §1391, in that a substantial amount of the events or omissions giving rise to the claims alleged herein occurred in the Eastern District of California in the Counties of Placer, Sacramento and San Joaquin, California. In addition, a number of the defendants sued herein, including employees and officers of the United States of America, and agencies thereof, acting in their official capacity and under color of legal authority, reside in or are employed in the Eastern District of California.

3.   At all times mentioned herein, Plaintiff was, and is, a corporation organized and existing under the laws of the State of California with its principal place of business in the Eastern District of California.

4.   At all times mentioned herein, Defendant City of New Haven ("Defendant New Haven") was, and presently is, a municipality located in the State of Connecticut.

5.      At all times mentioned herein, Defendant Kevin Johnson ("Defendant Johnson") was, and presently is, an individual residing and doing business in the Eastern District of California. Defendant Johnson is the former Mayor of the City of Sacramento.

6.      At all times mentioned herein, Defendant Nicole West ("Defendant West") was, and presently is, an individual residing and employed in the Eastern District of California.

7.      At all times mentioned herein, Defendant Toni Harp ("Defendant Harp") was the Mayor of Defendant New Haven and currently is no longer in that position.

8.      At all times mentioned herein, Defendant Daryl Jones ("Defendant Jones") was employed by Defendant New Haven as its Controller.

9.      At all times mentioned herein, Defendant Andrea Scott ("Defendant Scott") was employed by Defendant New Haven and was the Executive Assistant to Defendant Harp.

10.     At all times mentioned herein, Defendant Michael Tubbs ("Defendant Tubbs") was the Mayor of the City of Stockton, California, and currently is no longer in that position.

11.     At all times mentioned herein, Defendant Daniel Lopez ("Defendant Lopez") was employed by the City of Stockton, California, and was the Senior Advisor to Defendant Tubbs.

12.     At all times mentioned herein, Defendant Eric Garcetti ("Defendant Garcetti") was, and presently is, the Mayor of the City of Los Angeles, California.

13.     At all times mentioned herein, Defendant Gregory J. Stanton ("Defendant Stanton") was the Mayor of the City of Phoenix, Arizona, and is currently a Member of the United States House of Representatives as the Representative of Arizona's 9th Congressional District.

14.     At all times mentioned herein, Defendant Casey Lund ("Defendant Lund") was an individual employed as an independent contractor by Defendant FBI.

15.     The true names and capacities, whether individual, corporate, associate, partnership or otherwise, of Defendants named herein as DOES 1 through 999 are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. When the true names and capacities of said Defendants are ascertained, Plaintiff will amend the Complaint by inserting said true names and capacities in place of said fictitious names and capacities. Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 999, and each of them, are legally responsible in some manner for the events and happenings referred to herein, and proximately caused or contributed to the injuries and damages to Plaintiff which are hereinafter alleged. Whenever in this Complaint any Defendant is the subject of any charging allegation by Plaintiff, it shall be deemed that said Defendants DOES 1 through 999 are likewise the subject of said charging allegation.

16.     Plaintiff is informed and believes, and on the basis of that information and belief alleges, that Defendants, including the DOE defendants, were agents and employees of each other and in doing the acts alleged herein were acting within the course and scope of that agency and employment. At all times relevant herein, each of

4

the Defendants, including the DOE defendants, was the agent, servant, partner, officer, director, or employee of each of the remaining Defendants and was doing the acts herein complained of within the scope of his/her/its agency and employment.

## INTRODUCTION AND FACTUAL ALLEGATIONS COMMON
## TO ALL RICO COUNTS

17.     Plaintiff hereby re-alleges paragraphs 1 through 16 above and incorporates them herein as though set forth in full.

18.     At all relevant times mentioned herein, Plaintiff's business was providing a crowdsourcing platform with software and technical support to municipalities throughout the United States in order to increase road safety, to reduce distracted driving incidents, to issue and collect parking citations, and to generally improve community living conditions through Plaintiff's crowdsourcing platform. Plaintiff's crowdsourcing platform and software would benefit municipalities by producing revenue through electronic enforcement and collection of parking violations, and by other services geared to make the delivery of city services more cost efficient.

19.     In or about January of 2018, Plaintiff entered into an oral contract with an individual named Derek L. Bluford (hereinafter "Bluford") for Bluford to communicate with, and to obtain contracts with, municipalities to utilize the platform created by Plaintiff for various municipal functions, such as parking enforcement and other city services. The essential terms of the oral contract between Plaintiff and Bluford were as follows: Bluford was to communicate with, and to obtain contracts with, various municipalities in the United States to utilize Plaintiff's platform and services, and

Plaintiff would compensate Bluford for his services depending on the size of the contract that Bluford obtained for Plaintiff. Bluford's relationship with Plaintiff was that of an independent contractor.

20.     On or about July 1 2018, Bluford, as the independent contractor for Plaintiff, entered into a written "Consulting Agreement" with Defendant Johnson to market Plaintiff's services to include the cities of Los Angeles, California; Phoenix, Arizona; and New Haven, Connecticut. The Consulting Agreement had the following schedule of compensation that Defendant Johnson would receive for his services in marketing Plaintiff's services to the said municipalities: (1) Defendant Johnson would receive 17% of all current and future net revenues generated from Plaintiff's contract with the City of Los Angeles, California; (2) Defendant Johnson would receive 10% of all current and future net revenues generated from Plaintiff's contract with the City of Phoenix, Arizona; and (3) Defendant Johnson would receive 10% of all current and future net revenues generated from Plaintiff's contract with the City of New Haven, Connecticut. The Consulting Agreement was subsequently amended on July 31, 2018 to provide Defendant Johnson with up to 20% of equity ownership in Plaintiff in lieu of the revenue sharing arrangement stated in the original Consulting Agreement. At the time Defendant Johnson entered the Consulting Agreement with Plaintiff and at the time the Consulting Agreement was amended, Defendant Johnson had the intention to willingly, knowingly and illegally bribe the mayors of those cities in order to obtain contracts for Plaintiff. Plaintiff was never aware of Defendant Johnson's bribery scheme at any time when the bribery scheme was being implemented, and Plaintiff only became aware of

the bribery scheme when Bluford published a book in October of 2020 entitled *The Mighty Have Fallen*.

21.     On January 11, 2018, Defendant U.S. Attorney's Office issued a criminal indictment against Bluford for Wire Fraud and Monetary Transaction Involving Criminally Derived Funds.

22.     In or about October of 2018, Bluford and Defendant U.S. Attorney's Office began exploring ways for Bluford to assist Defendant U.S. Attorney's Office in the investigation of public corruption. Eventually, Bluford became a Confidential Human Source ("CHS") for Defendant FBI, with the goal of investigating public corruption using Bluford as the point man in Defendant FBI's sting operations. In these sting operations conducted by Defendant FBI under the direction of Defendant U.S. Attorney's Office, Bluford was instructed by Defendant FBI to offer and deliver bribes to mayors and municipal employees in return for securing contracts for Plaintiff's services. Defendant Johnson was a main target of this sting operation conducted by Defendant FBI. Defendant West was Defendant Johnson's assistant in conducting the bribery schemes described herein. Neither Defendant FBI nor Defendant U.S. Attorney's Office ever at any time informed Plaintiff that Plaintiff would be used as the company on behalf of whom the bribes would be offered in the sting operations, and neither Defendant FBI nor Defendant U.S. Attorney's Office ever obtained the consent of Plaintiff for Plaintiff to be used in the sting operations as the company on behalf of whom the bribes would be offered. Plaintiff only became aware of the sting operations when Bluford published a book in October of 2020 entitled *The Mighty Have Fallen*.

23.     Plaintiff is informed and believes, and on the basis of that information and belief alleges, that Bluford was granted complete civil and criminal immunity by Defendant U.S. Attorney's Office to operate as a CHS on behalf of Defendant FBI, and Bluford therefore has complete immunity with respect to his conduct alleged herein and with respect to Plaintiff's claims alleged herein. Based on Bluford's conduct as alleged herein, Plaintiff had filed a previous lawsuit against Bluford only in the El Dorado County Superior Court for breach of contract and for negligence, and it was through formal and informal discovery in that case that Plaintiff was able to learn of the details of Bluford's undercover work as a CHS for Defendant FBI. The previous case against Bluford was entitled *Government App Solutions, Inc. v. Derek L. Bluford,* El Dorado Superior Court Case No. PC 20200344 (the "El Dorado Case"). It was through formal and informal discovery in the El Dorado Case that Plaintiff was able to obtain from Bluford the detailed information, documents and facts that were set forth in the original Complaint and this First Amended Complaint Plaintiff has filed herein. Also through the El Dorado Case, Plaintiff's counsel gained access to view or to listen, but did not obtain possession of, audio and video recordings of Bluford's interactions with Defendant U.S. Attorney's Office and Defendant FBI, as Bluford recorded all of his in-person meetings and all of his telephone interactions with Defendant U.S. Attorney's Office and Defendant FBI.

24.     Defendant FBI informed Plaintiff in or about February of 2020 that Plaintiff's contract with the Defendant New Haven had not been obtained "in good faith", but Defendant FBI did not inform Plaintiff, or explain to Plaintiff, the reason why

8

Plaintiff's contract with Defendant New Haven had not been obtained "in good faith". Further, Defendant FBI did not inform Plaintiff at that time, or at any time, of its sting operations that had used Plaintiff as the company on whose behalf the bribes were being offered by Bluford, who was Defendant FBI's CHS.

25.     As a CHS for Defendant FBI, with Defendant Johnson sometimes providing the money but always arranging the meetings, Bluford did in fact deliver cash bribes or arrange for online payments to the city officials, all disguised as contributions to the city official's re-election campaign. The recipients of such bribes were Defendant Harp and Defendant Stanton. Defendant Tubbs agreed to receive a bribe, but Bluford's role as a CHS terminated before the bribe could be delivered to Defendant Tubbs. In return for sometimes providing the money but always arranging the meetings and making the deals for the bribes to be made to the said Defendants, Defendant Johnson was to receive a percentage of the money generated by Plaintiff's contract with the municipality whose public official had been bribed, pursuant to the terms of the Consulting Agreement described above.

26.     For purposes of Plaintiff's RICO claim, Defendants Johnson, Harp, Jones, Tubbs, Lopez, Garcetti and Stanton are all the "culpable persons" who are capable of holding a legal or beneficial interest in property. Defendant Johnson, along with the association of Defendant West and Bluford, comprise the association-in-fact enterprise common to all of the bribery schemes described herein. There were four different association-in-fact enterprises, one such enterprise for each of the four cities whose mayors received bribes or who had agreed to receive bribes. Defendant Johnson,

Defendant West and Bluford were members of all four association-in-fact enterprises, and the other members of the association-in-fact enterprises were unique to each of the four cities of New Haven, Phoenix, Los Angeles and Stockton, as more fully described in detail in the individual RICO claims set forth below. In addition, Defendant Johnson conspired with Defendants West, Harp, Jones, Tubbs, Lopez, Garcetti and Stanton to violate, and in fact did violate, Federal and state laws outlawing bribery, conspiracy to bribe, mail fraud and wire fraud. All of these events and occurrences are described more fully and in detail in the individual RICO claims set forth below.

27.     The bribery schemes and the illegal four association-in-fact enterprises described above affected interstate commerce, as the bribes and the conspiracy to bribe took place in California, Arizona and Connecticut in order to influence the corrupt officials (named defendants herein) to utilize the services of Plaintiff, a California corporation. Plaintiff's legitimate services affected interstate commerce, in that Plaintiff offered its services to municipalities throughout the United States.

28.     There was a pattern of racketeering perpetrated by Defendant Johnson and Defendant West and Bluford in their four illegal bribery enterprises, in that there were multiple acts of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity.  The acts of racketeering were related and continuous so as to form a pattern of racketeering. The pattern of racketeering is more fully described in detail in the individual RICO claims set forth below.

29.     Plaintiff sustained damages and injuries to its business and property by

reason of the violation of 18 U.S.C. §1962 (the RICO civil statute) by Defendants Johnson, West, Harp, Jones, Tubbs, Lopez, Garcetti and Stanton, as more fully described in detail in the individual RICO claims set forth below.

### COUNT I

### Violations of RICO §1962(c) and §1962(d)

### [Against Defendants Johnson, West, Harp, Scott and Jones]

30.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 29 above as if fully set forth herein.

31.    This Count I is against Defendants Johnson, West, Harp, Scott and Jones (the "Count I Defendants"). The Count I Defendants, along with Bluford, comprised the association-in-fact enterprise with respect to the City of New Haven, Connecticut.

32.    At all relevant times mentioned herein, Plaintiff was engaged in interstate commerce and Plaintiff's activities affected interstate commerce in that Plaintiff offered its services to municipalities in various states. In addition, the association-in-fact enterprise consisting of the Count I Defendants, plus Bluford, and the pattern of racketeering engaged in by the Count I Defendants, affected interstate commerce.

33.    The Count I Defendants agreed to and did conduct and participate in the conduct of the association-in-fact enterprise through a pattern of racketeering activity, and for the unlawful purpose of conducting business through bribes, conspiracy to bribe, wire fraud, and mail fraud by the following unlawful predicate acts, in which the Count I Defendants acted willfully and with actual knowledge of the illegal activities:

(a)    On August 24, 2019, Defendant Harp, who at the time was the Mayor of

11

the City of New Haven, Connecticut, and Defendant Scott accepted an in-person cash bribe of $7,000 from Bluford, and around that same time period of August and September of 2019, Defendant Harp also received cash and on-line donations as bribes in the amount of $25,000, all in return for the City of New Haven granting a contract to Plaintiff for Plaintiff's services. These bribes, which were negotiated by Defendant Johnson and Bluford with Defendant Harp, were paid to Defendant Harp by money supplied to Bluford by Defendant FBI, and the total amount of the bribes was in excess of $25,000, which included the $7,000 cash bribe given in-person by Bluford to Defendant Harp. After the bribes were paid, the City of New Haven did enter into a contract with Plaintiff for Plaintiff's services. At all times mentioned herein, Plaintiff was never aware that the contract had been obtained corruptly through bribery. The bribes given to, and accepted by, Defendant Harp were in violation of the Federal bribery statute, 18 U.S.C. §666(a), which applies to entities like the City of New Haven, which receive benefits of $10,000 or more from Federal programs.  The bribes given to and accepted by Defendant Harp were also in violation of the Federal conspiracy statute, 18 U.S.C. §371.

(b)     In furtherance of the bribery scheme of the Count I Defendants described above, the Count I Defendants also committed a violation of 18 U.S.C. §1343, the Federal wire fraud statute, by text messages sent between Bluford and Defendant Jones on August 24, August 25, August 26, August 27, August 28 2019, and in September of 2019. These text messages were in furtherance of the bribery scheme described above.

(c)     In furtherance of the bribery scheme of the Count I Defendants described

above, the Count I Defendants also committed a violation of 18 U.S.C. §1341, the mail fraud statute, when Defendants Scott, Harp and Jones arranged for a certified letter to be mailed to Bluford on September 3, 2019 containing a $7,000 check that was being sent to Bluford to repay Bluford for the $7,000 cash in-person bribe described above, which was a bribe disguised as a contribution to Defendant Harp's re-election campaign. The $7,000 check was mailed to Bluford because Defendant Harp had become suspicious of the $7,000 in-person cash bribe she had received from Bluford. Defendant Scott was the remitter of the $7,000 check being mailed to Bluford to return the $7,000 cash bribe Defendant Harp had received. The use of the mail was in furtherance of the bribery scheme described above. After Bluford received the $7,000 check mailed to him by Defendant Scott, Bluford was instructed by Defendants Harp and Scott to make an on-line donation of $7,000 to Defendant Harp's re-election campaign to replace the $7,000 cash bribe that was returned to Bluford by Defendant Scott. This use of the internet to bribe Defendant Harp was another violation of 18 U.S.C. §1343, the Federal wire fraud statute and was in furtherance of the bribery scheme described above.

(d)    As part of the bribery scheme, Defendants Harp and Johnson agreed that they would split the 10% of the net revenues that Plaintiff's contract with the City of New Haven would generate, as Defendant Johnson had previously entered into the Consulting Agreement with Plaintiff described above in which Plaintiff agreed to give to Defendant Johnson 10% of the net revenues from the City of New Haven contract in return for Defendant Johnson's help in securing that contract.

34.    Pursuant to and in furtherance of their illegal bribery scheme, the Count I

13

Defendants committed multiple related acts of racketeering activity as described in paragraph 33 above, subsections (a) through (d).

35.     The acts of bribery, conspiracy to commit bribery, wire fraud and mail fraud described in detail in paragraph 39 above, subsections (a) through (d), constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

36.     The Count I Defendants have directly and indirectly conducted and participated in the conduct of the association-in-fact enterprise's affairs through the pattern of racketeering and activity described in paragraph 39 above, subsections (a) through (d), in violation of 18 U.S.C. §1962(c).

37.     As set forth above in paragraphs 31 through 36, the Count I Defendants agreed and conspired to violate 18 U.S.C. §1962(c). The specific conduct of the Count I Defendants in conspiring to violate 18 U.S.C. §1962(c) is set forth above in paragraphs 31 through 46.

38.     The Count I Defendants have intentionally conspired and agreed to participate in the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity as set forth above in paragraphs 31 through 36. The Count I Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the bribery scheme as set forth above in paragraphs 31 through 36. That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

39.     As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 31

through 36, and as a direct and proximate result of the Count I Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. §1962(d) as described above in paragraphs 31 through 36, Plaintiff has been injured in its business and property as follows:

(a)     Plaintiff has lost all value as a viable company due to the bribery scheme of the Count I Defendants as described above, in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero.

(b)     Plaintiff spent $150,000 in out-of-pocket costs pursuant to its contract with Defendant New Haven. Due to the bribery scheme of the Count I Defendants, Defendant New Haven has refused to reimburse Plaintiff for this $150,000 expenditure.

(c)     Plaintiff expended several hundreds of thousands of dollars to develop the platform for its contract with Defendant New Haven. Plaintiff has not been reimbursed for this expenditure.

(d)     By directly involving Plaintiff, without Plaintiff's knowledge or consent, in the bribery scheme described above in paragraphs 31 through 36, the Count I Defendants have caused Plaintiff to be an involuntary and direct participant in criminal activity, and thus have caused direct and irreparable damage to Plaintiff by making Plaintiff an involuntary and direct participant in the Count I Defendants' criminal activity.

(e)     There were no other circumstances, causes, factors, or reasons causing Plaintiff's total loss of value and Plaintiff's other damages other than the criminal racketeering activities and violations of 18 U.S.C. §1962(c) by the Count I Defendants, the Count II Defendants, the Count III Defendants, and the Count IV Defendants, as alleged herein in Counts I, II, III, and IV of this Second Amended Complaint.

(f)     Plaintiff's damages are easily ascertainable as follows: (1) $15 Million Dollars for the complete loss of value of Plaintiff; (2) the $150,000 in out-of-pocket costs Plaintiff expended pursuant to its contract with Defendant New Haven and (3) the hundreds of thousands of dollars Plaintiff expended, in an amount to be established by proof at trial, to develop the platform specifically for Defendant New Haven.

(g)     The publication of Bluford's book in October of 2020 entitled *The Mighty Have Fallen* did not cause the damages that Plaintiff is claiming herein, as by the time Bluford's book was published, Plaintiff had already been damaged by the Count I Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), as described above in paragraphs 31 through 36. Further, the exercise of constitutionally-protected free speech activity, such as the publishing of Bluford's book, cannot be the proximate cause of Plaintiff's damages as a matter of public policy.

40.     Defendant New Haven was not the victim of the Count I Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 31 through 36, as Defendant New Haven suffered no monetary loss or damages, and suffered no other damages whatsoever, as a result of the Count I Defendants' above-described racketeering activities. Plaintiff was the actual and sole

16

victim of the Count I Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 31 through 36.

41.    WHEREFORE, Plaintiff requests the Court to enter judgment against the Count I Defendants as set forth below.

## COUNT II

### Violations of RICO §1962(c) and §1962(d)

**[Against Defendants Johnson, West and Stanton]**

42.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 41 above as if fully set forth herein.

43.    This Count II is against Defendants Johnson, West and Stanton (the "Count II Defendants"). The Count II Defendants, along with Bluford, comprised the association-in-fact enterprise with respect to the city of Phoenix, Arizona.

44.    At all relevant times mentioned herein, Plaintiff was engaged in interstate commerce and Plaintiff's activities affected interstate commerce in that Plaintiff offered its services to municipalities throughout the United States. In addition, the association-in-fact enterprise consisting of the Count II Defendants, plus Bluford, and the pattern of racketeering engaged in by the Count II Defendants, affected interstate commerce.

45.    The Count II Defendants agreed to and did conduct and participate in the conduct of the association-in-fact enterprise through a pattern of racketeering activity, and for the unlawful purpose of conducting business through bribes, conspiracy to bribe, wire fraud, and mail fraud by the following unlawful predicate acts, in which the Count II Defendants acted willfully and with actual knowledge of the illegal activities:

17

(a)     In or about January of 2018, when Defendant Stanton was the mayor of the city of Phoenix, Defendant Stanton agreed to accept a payment of $25,000 in exchange for his helping Plaintiff to obtain a contract with the city of Phoenix. The $25,000 payment was, in fact, to be a bribe to be given to Defendant Stanton and negotiated and arranged by Defendant Johnson and by Bluford. Defendant Stanton's agreement to accept the $25,000 bribe, and Defendant Johnson's agreement to pay the $25,000 bribe, constituted a conspiracy between Defendant Stanton and Defendant Johnson to bribe Defendant Stanton in violation of the Federal conspiracy statute, 18 U.S.C. §371.

(b)     In furtherance of the bribery scheme of the Count II Defendants described above, in or about the first few months of 2018, Defendant Stanton accepted a bribe in the amount of $15,000 that was paid to him by Defendant Johnson. The $15,000 bribe given to, and accepted by, Defendant Stanton was in violation of the Federal bribery statute, 18 U.S.C. §666(a), which applies to entities like the City of Phoenix, which receive benefits of $10,000 or more from Federal programs. The $15,000 was a partial payment of the $25,000 that had been promised to Defendant Stanton. The balance of $10,000 was to be paid to Defendant Stanton after Plaintiff had received a contract from the city of Phoenix, but Plaintiff never received such a contract.

(c)     In furtherance of the bribery scheme of the Count II Defendants described above, the Count II Defendants also committed multiple violations of 18 U.S.C. §1343, the Federal wire fraud statute. For example, on February 7, 2018, after Bluford had sent an email to Defendant Stanton, Defendant Stanton sent an email to Bluford warning Bluford that the public and media had access to Defendant Stanton's public email address. On February 7, 2018, Defendant West sent an email to Bluford informing

Bluford of Defendant Stanton's private email address. On April 30, 2018, Defendant Johnson sent an email to Bluford and to Defendant West in furtherance of the Count II Defendants' bribery scheme. All these emails were in furtherance of the bribery scheme described above, and each email constitutes wire fraud in violation of 18 U.S.C. §1343.

46.     Pursuant to and in furtherance of their illegal bribery scheme, the Count II Defendants committed multiple related acts of racketeering activity as described in paragraph 50 above, subsections (a) through (c).

47.     The acts of bribery, conspiracy to commit bribery, wire fraud and mail fraud described in detail in paragraph 45 above, subsections (a) through (c), constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

48.     The Count II Defendants have directly and indirectly conducted and participated in the conduct of the association-in-fact enterprise's affairs through the pattern of racketeering and activity described in paragraph 45 above, subsections (a) through (c), in violation of 18 U.S.C. §1962(c).

49.     As set forth above in paragraphs 43 through 48, the Count II Defendants agreed and conspired to violate 18 U.S.C. §1962(c). The specific conduct of the Count II Defendants in conspiring to violate 18 U.S.C. §1962(c) is set forth above in paragraphs 43 through 48.

50.     The Count II Defendants have intentionally conspired and agreed to participate in the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity as set forth above in paragraphs 43 through 48. The Count II Defendants knew that their predicate acts were part of a pattern of racketeering

activity and agreed to the commission of those acts to further the bribery scheme as set forth above in paragraphs 43 through 48. That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

51.     As a direct and proximate result of the Count II Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above, and as a direct and proximate result of the Count II Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. §1962(d) as described above, Plaintiff has been injured in its business and property as follows:

(a)     Plaintiff has lost all value as a viable company due to the bribery scheme of the Count II Defendants as described above, in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero.

(b)     Plaintiff expended substantial amounts of money to develop the platform specifically for the city of Phoenix. Plaintiff has not been reimbursed for this expenditure.

(c)     By directly involving Plaintiff, without Plaintiff's knowledge or consent, in the bribery scheme described above in paragraphs 43 through 48, the Count II Defendants have caused Plaintiff to be an involuntary and direct participant in criminal activity, and thus have caused direct and irreparable damage to Plaintiff by making Plaintiff an involuntary and direct participant in the Count II Defendants' criminal

activity.

(e)     There were no other circumstances, causes, factors, or reasons causing Plaintiff's total loss of value and Plaintiff's other damages other than the criminal racketeering activities and violations of 18 U.S.C. §1962(c) by the Count I Defendants, the Count II Defendants, the Count III Defendants, and the Count IV Defendants, as alleged herein in Counts I, II, III, and IV of this Second Amended Complaint.

(f)     Plaintiff's damages are easily ascertainable as follows: (1) $15 Million Dollars for the complete loss of value of Plaintiff; and (2) the substantial amounts of money Plaintiff expended, in an amount to be established by proof at trial, to develop the platform specifically for the city of Phoenix.

(g)     The publication of Bluford's book in October of 2020 entitled *The Mighty Have Fallen* did not cause the damages that Plaintiff is claiming herein, as by the time Bluford's book was published, Plaintiff had already been damaged by the Count II Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), as described above in paragraphs 43 through 48. Further, the exercise of constitutionally-protected free speech activity, such as the publishing of Bluford's book, cannot be the proximate cause of Plaintiff's damages as a matter of public policy.

52.     The city of Phoenix was not the victim of the Count II Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 43 through 48, as the city of Phoenix suffered no monetary loss or damages, and suffered no other damages whatsoever, as a result of Defendants' above-described racketeering activities. Plaintiff was the actual and sole victim of the Count II

21

Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 43 through 48.

53.     WHEREFORE, Plaintiff requests the Court to enter judgment against the Count II Defendants as set forth below.

## COUNT III

### Violation of RICO §1962(c) and §1962(d)

**[Against Defendants Johnson, West and Garcetti]**

54.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 53 above as if fully set forth herein.

55.     This Count III is against Defendants Johnson, West and Garcetti (the "Count III Defendants"). The Count III Defendants, along with Bluford, comprised the association-in-fact enterprise with respect to the city of Los Angeles, California.

56.     At all relevant times mentioned herein, Plaintiff was engaged in interstate commerce and Plaintiff's activities affected interstate commerce in that Plaintiff offered its services to municipalities throughout the United States. In addition, the association-in-fact enterprise consisting of the Count III Defendants, plus Bluford, and the pattern of racketeering engaged in by the Count III Defendants, affected interstate commerce.

57.     The Count III Defendants agreed to and did conduct and participate in the conduct of the association-in-fact enterprise through a pattern of racketeering activity, and for the unlawful purpose of conducting business through conspiracy to bribe, wire fraud, and mail fraud by the following unlawful predicate acts, in which the Count III Defendants acted willfully and with actual knowledge of the illegal activities:

22

(a)     In or about May of 2018, when Defendant Garcetti was the Mayor of the city of Los Angeles, Defendant Garcetti and Defendant Johnson agreed to a bribery scheme in which Defendant Garcetti would be given compensation in exchange for his help with Plaintiff obtaining a contract with the Los Angeles Department of Transportation ("LADOT"). The bribery scheme was that Defendant Garcetti and Defendant Johnson would split 17% of the net revenues Plaintiff would receive through its contract with the LADOT. Defendant Johnson subsequently obtained a Consulting Agreement with Plaintiff on July 1, 2018 in which Defendant Johnson would receive 17% of the net revenues Plaintiff was to receive from any contract Plaintiff obtained with the city of Los Angeles. The agreement by Defendant Garcetti and Defendant Johnson to split 17% of the net revenues constituted a conspiracy between Defendant Garcetti and Defendant Johnson to bribe Defendant Garcetti in violation of the Federal conspiracy statute, 18 U.S.C. §371. Any bribe actually given by Defendant Johnson to Defendant Garcetti would have been in violation of the Federal bribery statute, 18 U.S.C. §666(a), which applies to entities like the city of Los Angeles, which receive benefits of $10,000 or more from Federal programs.

(b)     In furtherance of the bribery scheme of the Count III Defendants described above, in or about July of 2018, with Defendant Garcetti's assistance in obtaining the cooperation of the LADOT, Plaintiff and the LADOT signed a Memorandum of Understanding in which Plaintiff would provide its services to the LADOT and would be amply compensated for its services. The entering into the Memorandum of Understanding by LADOT with Plaintiff was against city policy and procedure, as normally the contract would have had to go into the public procurement process, with the issuance by the LADOT of Requests for Proposals from the public for the services needed. Instead, with Defendant Garcetti's intervention, the LADOT signed a Memorandum of Understanding with Plaintiff, who had not even a submitted a proposal

to the LADOT.

(c)     In furtherance of the bribery scheme of the Count III Defendants described above, the Count III Defendants committed multiple violations of 18 U.S.C. §1343, the Federal wire fraud statute. For example, on May 25, 2018, Bluford sent an email to Borja Leon, the city of Los Angeles Director of Transportation, stating that he (Bluford) was not getting cooperation from the LADOT with respect to Plaintiff's proposed services. On May 25, 2018, Borja Leon replied in an email to Bluford that he would let LADOT know to contact Bluford. On May 25, 2018, Brian Hale, the Chief of Parking, sent an email to Bluford stating that the Mayor's Office wanted the Parking Department to explore possibilities of using Plaintiff's services. On July 11, July 16, July 18, July 26, and July 31, Bluford and Brian Hale exchanged emails with respect to the written Memorandum of Understanding that would eventually be entered into by LADOT and Plaintiff. On August 16, 2019, Defendant West sent an email to Bluford stating that Defendant Garcetti was "already on the list". All these emails mentioned in this paragraph were in furtherance of the bribery scheme described above, and each email constitutes wire fraud in violation of 18 U.S.C. §1343.

58.     Pursuant to and in furtherance of their illegal bribery scheme, the Count II Defendants committed multiple related acts of racketeering activity as described in paragraph 61 above, subsections (a) through (c).

59.     The acts of bribery, conspiracy to commit bribery, wire fraud and mail fraud described in detail in paragraph 57 above, subsections (a) through (c), constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

60. The Count III Defendants have directly and indirectly conducted and participated in the conduct of the association-in-fact enterprise's affairs through the pattern of racketeering and activity described in paragraph 57 above, subsections (a) through (c), in violation of 18 U.S.C. §1962(c).

61. As set forth above in paragraphs 55 through 60, the Count III Defendants agreed and conspired to violate 18 U.S.C. §1962(c). The specific conduct of the Count III Defendants in conspiring to violate 18 U.S.C. §1962(c) is set forth above in paragraphs 55 through 60.

62. The Count III Defendants have intentionally conspired and agreed to participate in the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity as set forth above in paragraphs 55 through 60. The Count III Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the bribery scheme as set forth above in paragraphs 55 through 60. That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

63. As a direct and proximate result of the Count III Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 55 through 60, and as a direct and proximate result of the Count III Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. §1962(d) as described above in paragraphs 55 through 60, Plaintiff has been injured in its business and property as follows:

(a) Plaintiff has lost all value as a viable company due to the bribery scheme

of the Count III Defendants as described above, in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero.

(b)     Plaintiff expended hundreds of thousands of dollars to develop the platform specifically for the city of Los Angeles. Plaintiff has not been reimbursed for this expenditure.

(c)     There were no other circumstances, causes, factors, or reasons causing Plaintiff's total loss of value and Plaintiff's other damages other than the criminal racketeering activities and violations of 18 U.S.C. §1962(c) by the Count I Defendants, the Count II Defendants, the Count III Defendants, and the Count IV Defendants, as alleged herein in Counts I, II, III, and IV of this Second Amended Complaint.

(d)     The publication of Bluford's book in October of 2020 entitled *The Mighty Have Fallen* did not cause the damages that Plaintiff is claiming herein, as by the time Bluford's book was published, Plaintiff had already been damaged by the Count III Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), as described above in paragraphs 55 through 60. Further, the exercise of constitutionally-protected free speech activity, such as the publishing of Bluford's book, cannot be the proximate cause of Plaintiff's damages as a matter of public policy.

64.     The city of Los Angeles was not the victim of the Count III Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in

paragraphs 55 through 60, as the city of Los Angeles suffered no monetary loss or damages, and suffered no other damages whatsoever, as a result of Defendants' above-described racketeering activities. Plaintiff was the actual and sole victim of the Count III Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 55 through 60.

65.     WHEREFORE, Plaintiff requests the Court to enter judgment against the Count III Defendants as set forth below.

## COUNT IV

### Violation of RICO §1962(c) and §1962(d)

**[Against Defendants Johnson, West, Tubbs and Lopez]**

66.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 65 above as if fully set forth herein.

67.     This Count IV is against Defendants Johnson, West, Tubbs and Lopez (the "Count IV Defendants"). The Count IV Defendants, along with Bluford, comprised the association-in-fact enterprise with respect to the city of Stockton, California.

68.     At all relevant times mentioned herein, Plaintiff was engaged in interstate commerce and Plaintiff's activities affected interstate commerce in that Plaintiff offered its services to municipalities throughout the United States. In addition, the association-in-fact enterprise consisting of the Count IV Defendants, plus Bluford, and the pattern of racketeering engaged in by the Count IV Defendants, affected interstate commerce.

69.     The Count IV Defendants agreed to and did conduct and participate in the conduct of the association-in-fact enterprise through a pattern of racketeering activity,

and for the unlawful purpose of conducting business through conspiracy to bribe, wire fraud, and mail fraud by the following unlawful predicate acts, in which the Count IV Defendants acted willfully and with actual knowledge of the illegal activities:

(a)     In January of 2018, Defendant Tubbs, Defendant Johnson, Defendant Lopez and Bluford agreed in a telephone call to give Plaintiff a contract from the city of Stockton for parking enforcement in exchange for a revenue kickback to Defendant Tubbs, where Defendant Johnson and Defendant Tubbs would split the 10% of Plaintiff's revenues generated by the contract with the city of Stockton. This 10% was what Defendant Johnson was to receive through his Consulting Agreement with Plaintiff referenced above.

(b)     On October 29, 2019, when Defendant Tubbs was the Mayor of the city of Stockton, Defendant Tubbs and Defendant Lopez were on a telephone call with Defendant Johnson and Bluford. In that telephone call, Defendants Tubbs, Lopez, Johnson and Bluford all agreed on a "quid pro quo" deal for Plaintiff to obtain a contract with the city of Stockton, and in return Defendant Tubbs would receive money from Defendant Johnson. Defendant Lopez agreed to facilitate the quid pro quo bribery arrangement between Defendant Tubbs and Defendant Johnson and Bluford. As part of the quid pro quo arrangement, Defendant Tubbs also agreed to give false references for Plaintiff by telling other cities who called for references that the city of Stockton was in contract with Plaintiff and that Plaintiff was giving good services to the city, when in fact the city of Stockton was not in contract with Plaintiff. Defendant Tubbs did in fact give a false reference for Plaintiff as part of the quid pro quo arrangement.

28

(c)    On February 6, 2020, Defendant Tubbs told Bluford that the city of Stockton would give a contract to Plaintiff in return for campaign contributions to Defendant Tubbs' re-election campaign. The amount discussed by Defendant Tubbs and Bluford was $35,000, to be provided by Defendant Johnson and Bluford. The agreements made on October 29, 2019 and on February 6, 2020 between Defendant Tubbs and Defendant Johnson for Defendant Johnson to give money to Defendant Tubbs' re-election campaign in return for a city contract to Plaintiff, and in return for Defendant Tubbs giving false references for Plaintiff constituted a conspiracy between Defendant Tubbs and Defendant Johnson to bribe Defendant Tubbs in violation of the Federal conspiracy statute, 18 U.S.C. §371. Any bribe actually given by Defendant Johnson to Defendant Tubbs would have been in violation of the Federal bribery statute, 18 U.S.C. §666(a), which applies to entities like the city of Stockton, which receive benefits of $10,000 or more from Federal programs. Before any bribe could be paid to Defendant Tubbs, Bluford's role as a CHS with Defendant FBI was terminated.

(d)    In furtherance of the bribery scheme of the Count IV Defendants described above, the Count IV Defendants committed multiple violations of 18 U.S.C. §1343, the Federal wire fraud statute, by sending various emails. For example, on January 29, 2020, Defendant Lopez sent an email to Cameron Burns, an employee of the city of Stockton, stating that Bluford and Defendant Johnson were looking to meet with Defendant Tubbs and requested suitable times for the meeting. On February 22, 2018, Defendant Lopez sent an email to Bluford offering his help. On December 2, 2019, Defendant Johnson sent an email to Bluford mentioning Defendant Tubbs as a person who Bluford should

contact, and Bluford replied to Defendant Johnson's email. All these emails mentioned in this paragraph were in furtherance of the bribery scheme described above, and each email constitutes wire fraud in violation of 18 U.S.C. §1343.

(e)     In furtherance of the bribery scheme of the Count IV Defendants described above, the Count IV Defendants committed multiple violations of 18 U.S.C. §1343, the Federal wire fraud statute, by exchanging multiple text messages. For example, in February of 2018, Bluford sent a text message to Defendant Lopez setting forth a false reference for Plaintiff that Defendant Lopez could give to the City of New Haven, who had contacted Defendant Lopez for a reference for Plaintiff. On February 15, 2018, Defendant Lopez replied to Bluford's text message about the false reference by stating "That works sorry for the delay". On April 11, 2018 Bluford sent a text message to Defendant Lopez inquiring whether the City of New Haven had contacted Defendant Lopez regarding a reference for Plaintiff. On April 12, 2018 Defendant Lopez replied to Bluford's text by asking if Bluford was available to talk. There were more text exchanges between Bluford and Defendant Lopez in furtherance of the bribery scheme described above on May 16, 2018 and April 17, 2019. There were also other text exchanges among Defendant Tubbs, Defendant Lopez, Defendant Johnson and Bluford in furtherance of the bribery scheme described above. All these text messages mentioned in this paragraph were in furtherance of the bribery scheme described above, and each text message constitutes wire fraud in violation of 18 U.S.C. §1343.

70.     Pursuant to and in furtherance of their illegal bribery scheme, the Count IV Defendants committed multiple related acts of racketeering activity as described in

paragraph 69 above, subsections (a) through (e).

71.     The acts of conspiracy to commit bribery, wire fraud and mail fraud described in detail in paragraph 69 above, subsections (a) through (e), constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

72.     The Count IV Defendants have directly and indirectly conducted and participated in the conduct of the association-in-fact enterprise's affairs through the pattern of racketeering and activity described in paragraph 69 above, subsections (a) through (e), in violation of 18 U.S.C. §1962(c).

73.     As set forth above in paragraphs 67 through 72, the Count IV Defendants agreed and conspired to violate 18 U.S.C. §1962(c). The specific conduct of the Count IV Defendants in conspiring to violate 18 U.S.C. §1962(c) is set forth above in paragraphs 67 through 72.

74.     The Count IV Defendants have intentionally conspired and agreed to participate in the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity as set forth above in paragraphs 67 through 72. The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the bribery scheme as set forth above in paragraphs 67 through 72. That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

75.     As a direct and proximate result of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 67 through 72, and as a direct and proximate result of the Count IV Defendants' conspiracy,

the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. §1962(d) as described above in paragraphs 67 through 72, Plaintiff has been injured in its business and property as follows:

(a)    Plaintiff has lost all value as a viable company due to the bribery scheme of the Count IV Defendants as described above, in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero.

(b)    Plaintiff expended a substantial sum of money to develop the platform specifically for the city of Stockton. Plaintiff has not been reimbursed for this expenditure.

(c)    By directly involving Plaintiff, without Plaintiff's knowledge or consent, in the bribery scheme described above in paragraphs 67 through 72, the Count IV Defendants have caused Plaintiff to be an involuntary participant in criminal activity, and thus have caused direct and irreparable damage to Plaintiff by making Plaintiff an involuntary participant in the Count IV Defendants' criminal activity.

(d)    There were no other circumstances, causes, factors, or reasons causing Plaintiff's total loss of value and Plaintiff's other damages other than the criminal racketeering activities and violations of 18 U.S.C. §1962(c) by the Count I Defendants, the Count II Defendants, the Count III Defendants, and the Count IV Defendants, as alleged herein in Counts I, II, III, and IV of this Second Amended Complaint.

(e)     Plaintiff's damages are easily ascertainable as follows: (1) $15 Million Dollars for the complete loss of value of Plaintiff; and (2) the substantial sum of money Plaintiff expended, in an amount to be established by proof at trial, to develop the platform specifically for the city of Stockton.

(f)     The publication of Bluford's book in October of 2020 entitled *The Mighty Have Fallen* did not cause the damages that Plaintiff is claiming herein, as by the time Bluford's book was published, Plaintiff had already been damaged by the Count IV Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), as described above in paragraphs 67 through 72. Further, the exercise of constitutionally-protected free speech activity, such as the publishing of Bluford's book, cannot be the proximate cause of Plaintiff's damages as a matter of public policy.

76.     The city of Stockton was not the victim of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 67 through 72, as the city of Stockton suffered no monetary loss or damages, and suffered no other damages at all, as a result of Defendants' above-described racketeering activities. Plaintiff was the actual and sole victim of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) as described above in paragraphs 67 through 72.

77.     WHEREFORE, Plaintiff requests the Court to enter judgment against the Count IV Defendants as set forth below.

### COUNT V

**[Negligence Against Defendants Johnson and West]**

33

78.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 77 above as if fully set forth herein.

79.     Defendant Johnson, as a shareholder and investor in Plaintiff, and as a contractor with Plaintiff, and Defendant West, as Defendant Johnson's employee or agent, had a legal duty of care toward Plaintiff not to cause harm to Plaintiff in their dealings and conduct with Plaintiff, and in their dealings and conduct with third parties on behalf of Plaintiff.

80.     Defendants Johnson and West violated their duty of care to Plaintiff, and were negligent with respect to Plaintiff, by their conduct, actions and racketeering activities as set forth above in paragraphs 31 through 36, paragraphs 43 through 48, paragraphs 55 through 60, and paragraphs 67 through 72. In committing the conduct, actions and racketeering activities described those paragraphs just cited, Defendants Johnson and West violated their duty of care toward Plaintiff, were negligent with respect to Plaintiff, and were the legal and proximate cause of damages to Plaintiff.

81.     As a proximate result Defendant Johnson's and West's negligent conduct, actions and racketeering activities as set forth above in paragraphs 31 through 36, paragraphs 43 through 48, paragraphs 55 through 60, and paragraphs 67 through 72, Plaintiff has suffered damages and injuries as follows:

(a)     Plaintiff has lost all value as a viable company due to Defendant Johnson's and West's negligence as described above, in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme

became public knowledge, the value of Plaintiff has plummeted to zero.

(b)     Plaintiff expended substantial sums of money in amounts to be determined by proof at trial to develop the platforms specifically for the cities of New Haven, Phoenix, Los Angeles, and Stockton. In addition, Plaintiff spent $150,000 in out-of-pocket costs pursuant to its contract with Defendant New Haven. Plaintiff has not been reimbursed for any of these expenditures.

(c)     The publication of Bluford's book in October of 2020 entitled *The Mighty Have Fallen* did not cause the damages that Plaintiff is claiming herein, as by the time Bluford's book was published, Plaintiff had already been damaged by the negligence of Defendant Johnson, as described above in paragraphs 31 through 36, paragraphs 43 through 48, paragraphs 55 through 60, and paragraphs 67 through 72. Further, the exercise of constitutionally-protected free speech activity, such as the publishing of Bluford's book, cannot be the proximate cause of Plaintiff's damages as a matter of public policy.

82.     WHEREFORE, Plaintiff requests the Court to enter judgment against Defendant Johnson as set forth below.

## COUNT VI FOR BREACH OF CONTRACT

### [Against Defendant Johnson]

83.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 82 above as if fully set forth herein.

84.     On December 31, 2019 Defendant Johnson and Plaintiff entered into an agreement entitled "Shareholder Protection Agreement". A true and correct copy of the

Shareholder Agreement is attached hereto as Exhibit A.

85.     As part of the Shareholder Protection Agreement, Plaintiff and Defendant Johnson made the following agreement:

"Neither the Company nor the Shareholder shall take any action, or engage in any conduct, directly or indirectly, that would result in the Company's value being diminished, or that would cause any monetary or any other damages to the Company."

"The Company and the Shareholder agree and acknowledge that they each have the following mutual responsibilities:

a.     To refrain from taking any action, and to refrain from engaging in any conduct, that would directly or indirectly cause or result in the Company's value being diminished, or that would directly or indirectly cause any monetary or any other damages to the Company."

86.     The Shareholder Protection Agreement signed by Defendant Johnson also stated as follows:

"The Company and the Shareholder hereby agree and warrant that should either of them breach any of their mutual responsibilities as set forth above, including taking any action, or engaging in any conduct, directly or indirectly, that would result in the Company's value being diminished, or that would cause, directly or indirectly, any monetary or any other damages to the Company, then the Company and the Shareholder hereby agree as follows:

a.     If the violating party is the Company, then the person or persons in the Company who have violated his or her responsibilities as set forth above shall pay monetary damages to the Company in the amount that the Company has lost value, and he or she shall also pay to the Company the amount that the Company has suffered in monetary damages as a result of the violating party's conduct or actions.

b.     If the violating party is the Shareholder, then the Shareholder who has violated his or her responsibilities as set forth above shall pay monetary damages to the Company in the amount that the Company has lost value, and he or she shall also pay to

the Company the amount that the Company has suffered in monetary damages as a result of the violating party's conduct or actions."

87.     Plaintiff has performed all the conditions, covenants, and promises required on Plaintiff's part to be performed in accordance with the terms and conditions of the Shareholder Protection Agreement with Defendant Johnson, except those obligations that Plaintiff was prevented or excused from performing.

88.     After executing the Shareholder Protection Agreement on December 31, 2019, Defendant Johnson breached the Shareholder Protection Agreement on February 6, 2020 as follows: On February 6, 2020, Defendant Tubbs told Bluford that the city of Stockton would give a contract to Plaintiff in return for campaign contributions to Defendant Tubbs' re-election campaign. The amount discussed by Defendant Tubbs and Bluford was $35,000, to be provided by Defendant Johnson and Bluford. The agreement made on February 6, 2020 between Defendant Tubbs and Defendant Johnson for Defendant Johnson to give money to Defendant Tubbs' re-election campaign in return for a city contract to Plaintiff, and in return for Defendant Tubbs giving false references for Plaintiff, constituted a conspiracy between Defendant Tubbs and Defendant Johnson to bribe Defendant Tubbs in violation of the Federal conspiracy statute, 18 U.S.C. §371. Any bribe actually given by Defendant Johnson to Defendant Tubbs would have been in violation of the Federal bribery statute, 18 U.S.C. §666(a), which applies to entities like the city of Stockton, which receive benefits of $10,000 or more from Federal programs. Before any bribe could be paid to Defendant Tubbs, Bluford's role as a CHS with Defendant FBI was terminated.

37

89.    As a proximate and direct result of Defendant Johnson's breach of the Shareholder Protection Agreement as described above, Plaintiff has lost all value as a viable company, in that no municipality in the United States will do business with a company that was involved in offering and giving bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero. Thus, Plaintiff has suffered general damages in the amount of $15 Million Dollars as a proximate and direct result of Defendant Johnson's breach of the Shareholder Protection Agreement.

90. As a further proximate and direct result of Defendant Johnson's breach of the Shareholder Protection Agreement as described above, Plaintiff has suffered special damages for the hundreds of thousands of dollars Plaintiff expended to develop the platforms and software specifically for the cities of New Haven, Phoenix, Los Angeles and Stockton, in an amount to be established by proof at trial.

91.    On January 24, 2020, Defendant Johnson entered into a written Common Stock Purchase Agreement with Plaintiff in which Defendant Johnson purchased an additional 100,000 shares of Plaintiff's common stock. A true and correct copy of the Common Stock Purchase Agreement is attached hereto as Exhibit B.

92.    In the Common Stock Purchase Agreement is the following agreement made by Defendant Johnson and Plaintiff:

"The Purchaser agrees that the current valuation of the Company is $15,000,000 (Fifteen Million Dollars)...."

93.     Thus, by his own agreement, Defendant Johnson has acknowledged that Plaintiff's value as a company was $15 Million Dollars as of January 24, 2020, which was before Defendant Johnson's bribery schemes became public knowledge and Plaintiff's value as a company plummeted to zero.

94.     WHEREFORE, Plaintiff requests the Court to enter judgment against Defendant Johnson as set forth below.

## COUNT VII FOR BREACH OF CONTRACT

### [Against Defendant New Haven]

95.     Plaintiff intends to file a motion to remove Plaintiff's breach of contract claim against Defendant New Haven to the United States District Court for the District of Connecticut in New Haven, Connecticut. Federal jurisdiction in that court will be based on the diversity of citizenship between Plaintiff and Defendant New Haven.

## COUNT VIII FOR FRAUD

### [Against Defendant Lund]

96.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 95 above as if fully set forth herein.

97.     This Count VIII for fraud is against Defendant Lund.

98.     In November or December of 2019, FBI Special Agent Rebekah Bills ("Bills") directed Defendant Lund to pretend to be a buyer interested in purchasing or licensing Plaintiff's software. Pursuant to Bills' direction, Defendant Lund represented himself to Plaintiff as an employee of an agency of the State of California who was interested in purchasing or licensing Plaintiff's software for the State of California.

99.   In December of 2019, Defendant Lund made the following false representations to Plaintiff by emails and by texts that he sent to Plaintiff and to Bluford: Defendant Lund falsely represented that the State of California was interested in purchasing or licensing Plaintiff's software for its own use, and that he was authorized to negotiate a price for the purchase or licensing of Plaintiff's software on behalf of the State of California. These representations were false at the time Defendant Lund made the representations to Plaintiff and to Bluford, and Defendant Lund knew at the time he made the representations that the representations were false. In furtherance of Bills' and Lund's scheme to defraud Plaintiff of Plaintiff's software, Bills and Lund provided a template purchasing agreement and a template licensing agreement to Bluford to give to Plaintiff for Plaintiff's review. Plaintiff did in fact have its legal counsel review these template agreements.

100.   Believing and relying on Defendant Lund's false representations that the State of California wanted to purchase or license Plaintiff's software and that Defendant Lund was authorized to negotiate a deal with Plaintiff, at Defendant Lund's request Plaintiff provided a complete copy of Plaintiff's software to Defendant Lund for "testing" and "authenticating".

101.   Defendant Lund made the false representations described above to Plaintiff so that the FBI could obtain a copy of Plaintiff's software without paying for the software. Neither the State of California, nor Bills or Defendant Lund, at any time had any intention of purchasing or licensing Plaintiff's software, but Bills and Defendant Lund merely wanted to defraud Plaintiff of its software.

102.   Had Plaintiff known that the representations made by Defendant Lund that the State of California wanted to purchase or license Plaintiff's software and that Defendant Lund was authorized to negotiate a deal with Plaintiff were false representations, Plaintiff would not have provided a copy of its software to Defendant Lund.

103.   The FBI wanted a copy of Plaintiff's software to use in other sting operations involving bribery and public corruption so that the FBI could offer an authenticate "sample" of software it was marketing to the targets of its investigations.

104.   As a proximate and direct result of Bills' and Defendant Lund's fraud as described above, Plaintiff has suffered general and special damages in an amount to be established by proof at trial.

105.   The conduct Defendant Lund in defrauding Plaintiff as described above was oppressive and fraudulent and Plaintiff is entitled to an award of punitive damages against Defendant and Lund.

106.   WHEREFORE, Plaintiff requests the Court to enter judgment against Defendant Lund as set forth below.

## COUNT IX FOR THEFT

### [Against Defendant Lund]

107.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 106 above as if fully set forth herein.

108.   This Count IX for theft is against Defendant Lund.

109.   By his conduct and actions as set forth in paragraphs 98 to 103 above,

Defendant Lund has committed the civil tort of theft against Plaintiff by using false pretenses to obtain a copy of Plaintiff's software without paying for the software. The elements of theft as defined in California Penal Code §484(a) have been satisfied by the conduct and actions of Defendant Lund as set forth in paragraphs 128 to 135 above.

110.    As a proximate and direct result of Defendant Lund's theft as described in paragraph 109 above, Plaintiff has suffered general and special damages in an amount to be established by proof at trial.

111.    The conduct of Defendant Lund in committing theft against Plaintiff as described above was oppressive and fraudulent and Plaintiff is entitled to an award of punitive damages against Defendant Lund.

112.    WHEREFORE, Plaintiff requests the Court to enter judgment against Defendant Lund as set forth below.

### COUNT X FOR NEGLIGENCE

**[Against Defendants Harp, Scott, Jones, Stanton, Garcetti, Tubbs and Lopez]**

113.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 112 above as if fully set forth herein.

114.    Defendants Harp, Scott, Jones, Stanton, Garcetti, Tubbs and Lopez, as public servants in positions of public trust and authority, had a legal duty of care toward Plaintiff not to cause harm to Plaintiff in their dealings and conduct with respect to Plaintiff.

115.    Defendants West, Harp, Scott, Jones, Stanton, Garcetti, Tubbs and Lopez

violated their duty of care to Plaintiff, and were negligent with respect to Plaintiff, by their conduct, actions and racketeering activities as set forth above in paragraphs 31 through 36 (for Defendants West, Harper, Scott and Jones), paragraphs 43 through 48 (for Defendant Stanton), paragraphs 55 through 60 (for Defendant Garcetti), and paragraphs 67 through 72 (for Defendants Tubbs and Lopez). In committing the conduct, actions and racketeering activities described those paragraphs just cited, Defendants West, Harp, Scott, Jones, Stanton, Garcetti, Tubbs and Lopez violated their duty of care toward Plaintiff, were negligent with respect to Plaintiff, and were the legal and proximate cause of damages to Plaintiff.

81.    As a proximate result Defendants West, Harp, Scott, Jones, Stanton, Garcetti, Tubbs and Lopez's negligent conduct, actions and racketeering activities as set forth above in paragraphs 31 through 36 (for Defendants West, Harper, Scott and Jones), paragraphs 43 through 48 (for Defendant Stanton), paragraphs 55 through 60 (for Defendant Garcetti), and paragraphs 67 through 72 (for Defendants Tubbs and Lopez), Plaintiff has suffered damages and injuries as follows:

(a)    Plaintiff has lost all value as a viable company due to Defendant Johnson's negligence as described above, in that no municipality in the United States will now do business with a company that was involved in FBI sting operations offering bribes to public officials to secure city contracts. Before the bribery scheme became public knowledge, Plaintiff was valued at $15 Million Dollars. After the bribery scheme became public knowledge, the value of Plaintiff has plummeted to zero.

(b)    Plaintiff expended substantial sums of money in amounts to be determined by proof at trial to develop the platforms specifically for the cities of New Haven,

Phoenix, Los Angeles, and Stockton. In addition, Plaintiff spent $150,000 in out-of-pocket costs pursuant to its contract with Defendant New Haven. Plaintiff has not been reimbursed for any of these expenditures.

(c)     The publication of Bluford's book in October of 2020 entitled *The Mighty Have Fallen* did not cause the damages that Plaintiff is claiming herein, as by the time Bluford's book was published, Plaintiff had already been damaged by the negligence of Defendants West, Harp, Scott, Jones, Stanton, Garcetti, Tubbs and Lopez, as described above in paragraphs 31 through 36 (for Defendants West, Harper, Scott and Jones), paragraphs 43 through 48 (for Defendant Stanton), paragraphs 55 through 60 (for Defendant Garcetti), and paragraphs 67 through 72 (for Defendants Tubbs and Lopez). Further, the exercise of constitutionally-protected free speech activity, such as the publishing of Bluford's book, cannot be the proximate cause of Plaintiff's damages as a matter of public policy.

116.   WHEREFORE, Plaintiff requests the Court to enter judgment against Defendant Johnson as set forth below.

## PRAYER

**WHEREFORE,** Plaintiff GOVERNMENT APP SOLUTIONS, INC. prays for judgment against Defendants as follows:

### COUNT I FOR RICO CIVIL VIOLATIONS

**[Against Defendants Kevin Johnson, Nicole West,
Toni Harp and Daryl Jones]**

1.      For the total loss of Plaintiff's $15 Million Dollars value as a viable company, Plaintiff requests treble damages in the amount of $45 Million Dollars.

2.      For the $150,000 out-of-pocket costs incurred by Plaintiff pursuant to its contract with Defendant New Haven, Plaintiff requests treble damages in the amount of $450,000.

3.      For the several hundreds of thousands of dollars Plaintiff expended to develop the platform for its contract with Defendant New Haven, Plaintiff requests a judgment of treble damages according to proof at trial.

4.      For reasonable attorney's fees and costs according to proof at trial in bringing and prosecuting this action.

5.      For costs of suit incurred herein.

6.      For such other and further relief as the Court deems just and proper.

## COUNT II

### Violations of RICO §1962(c) and §1962(d)

**[Against Defendants Kevin Johnson, Nicole West**

**and Gregory J. Stanton]**

7.      For the total loss of Plaintiff's $15 Million Dollars value as a viable company, Plaintiff requests treble damages in the amount of $45 Million Dollars.

8.      For the sums of money Plaintiff expended to develop the platform specifically for the city of Phoenix in an amount to be established by proof at trial. Plaintiff requests treble of these damages according to proof at trial.

9.      For reasonable attorney's fees and costs according to proof at trial in

45

bringing and prosecuting this action.

10.     For costs of suit incurred herein.

11.     For such other and further relief as the Court deems just and proper.

### COUNT III

### Violation of RICO §1962(c) and §1962(d)

**[Against Defendants Kevin Johnson, Nicole West and Kevin Garcetti]**

12.     For the total loss of Plaintiff's $15 Million Dollars value as a viable company, Plaintiff requests treble damages in the amount of $45 Million Dollars.

13.     For the sums of money Plaintiff expended to develop the platform specifically for the city of Los Angeles in an amount to be established by proof at trial. Plaintiff requests treble of these damages according to proof at trial.

14.     For reasonable attorney's fees and costs according to proof at trial in bringing and prosecuting this action.

15.     For costs of suit incurred herein.

16.     For such other and further relief as the Court deems just and proper.

### COUNT IV

### Violation of RICO §1962(c) and §1962(d)

**[Against Defendants Kevin Johnson, Nicole West,**

**Michael Tubbs and Daniel Lopez]**

17.     For the total loss of Plaintiff's $15 Million Dollars value as a viable company, Plaintiff requests treble damages in the amount of $45 Million Dollars.

18.     For the sums of money Plaintiff expended to develop the platform

specifically for the city of Stockton in an amount to be established by proof at trial. Plaintiff requests treble of these damages according to proof at trial.

19.    For reasonable attorney's fees and costs according to proof at trial in bringing and prosecuting this action.

20.    For costs of suit incurred herein.

21.    For such other and further relief as the Court deems just and proper.

## COUNT V FOR NEGLIGENCE

### [Against Defendant Johnson]

22.    For general damages in the amount of $15 Million Dollars.

23.    For special damages for the hundreds of thousands of dollars Plaintiff expended to develop the platforms and software specifically for the cities of New Haven, Phoenix, Los Angeles and Stockton, in an amount to be established by proof at trial.

24.    For costs of suit incurred herein.

25.    For such other and further relief as the Court deems just and proper.

## COUNT VI FOR BREACH OF CONTRACT

### [Against Defendant Kevin Johnson]

26.    For general damages in the amount of $15 Million Dollars.

27.    For special damages for the hundreds of thousands of dollars Plaintiff expended to develop the platforms and software specifically for the cities of New Haven, Phoenix, Los Angeles and Stockton, in an amount to be established by proof at trial..

28.    For costs of suit incurred herein.

29.    For such other and further relief as the Court deems just and proper.

## COUNT VII FOR BREACH OF CONTRACT

### [Against Defendant City of New Haven]

30.     Plaintiff intends to file a motion to remove Plaintiff's breach of contract claim against Defendant New Haven to the United States District Court for the District of Connecticut in New Haven, Connecticut. Federal jurisdiction in that court will be based on the diversity of citizenship between Plaintiff and Defendant New Haven.

## COUNT VIII FOR FRAUD

### [Against Defendant Casey Lund]

31.     For general damages in the amount to be established by proof at trial.

32.     For special damages in an amount to be established by proof at trial.

33.     For punitive damages in an amount to be established by proof at trial.

34.     For costs of suit incurred herein.

35.     For such other and further relief as the Court deems just and proper.

## COUNT IX FOR THEFT

### [Against Defendant Casey Lund]

36.     For general damages in the amount to be established by proof at trial.

37.     For special damages in an amount to be established by proof at trial.

38.     For punitive damages in an amount to be established by proof at trial.

39.     For costs of suit incurred herein.

40.     For such other and further relief as the Court deems just and proper.

///

///

///

48

**COUNT X FOR NEGLIGENCE**

**[Against Defendants Harp, Scott, Jones, Stanton, Garcetti, Tubbs and**

**Lopez]**

41.     For general damages in the amount of $15 Million Dollars.

42.     For special damages for the hundreds of thousands of dollars Plaintiff expended to develop the platforms and software specifically for the cities of New Haven, Phoenix, Los Angeles and Stockton, in an amount to be established by proof at trial.

43.     For costs of suit incurred herein.

44.     For such other and further relief as the Court deems just and proper.

Cyrus Zal, A Professional Corporation

DATED: September 9, 2022          By:_____/s/ Cyrus Zal_____
                                                     CYRUS ZAL, Attorney for Plaintiff
                                                     GOVERNMENT APP SOLUTIONS, INC.

# EXHIBIT A

# SHAREHOLDER PROTECTION AGREEMENT

This is a Shareholder Protection Agreement (hereinafter "Agreement") made by and between Government App Solutions, Inc., a California corporation, located at 980 9th Street, 16th Floor Sacramento, CA 95814 (hereinafter "Company") and the shareholder identified as _____ Kevin Johnson _____, and whose address is ___ Seven, P.O. Box 5757, Sacramento, CA 95817 ___ (hereinafter "Shareholder").

RECITALS:

A.    WHEREAS, the Company has developed and acquired, and continues to develop and acquire, technology, financial and business plans, and strategic relationships, including an award of a very lucrative service contract by a municipality, all of which are making the Company more and more valuable;

B.    WHEREAS, the Company desires to protect the Company's continued success and growth, and desires to protect the Company and its shareholders from anything that could cause the Company to lose any of its value;

C.    WHEREAS, the Shareholder desires to have protection for the Shareholder's shares from anything that could cause the Company to lose any of its value, and thereby decrease the value of the Shareholder's shares;

NOW THEREFORE, in consideration of the Recitals stated above, the Company and the Shareholder are entering into this Agreement for their mutual benefit:

## 1.    The Company's and the Shareholder's Responsibilities and Warranties.

Neither the Company nor the Shareholder shall take any action, or engage in any conduct, directly or indirectly, that would result in the Company's value being diminished, or that would cause any monetary or any other damages to the Company.

The Company and the Shareholder agree and acknowledge that they each have the following mutual responsibilities:

a.    To refrain from taking any action, and to refrain from engaging in any conduct, that would directly or indirectly cause or result in the Company's value being diminished, or that would directly or indirectly cause any monetary or any other damages to the Company.

     b.      To not disclose to outside third parties, or to anyone else not authorized to receive such information, any of the Company's confidential information. "Confidential Information" means business information, pricing and contract terms, financial results, forecasts and projections, technical information, algorithms, source codes, performance statistics, product development plans, business proposals, know-how, trade secrets, and other information of a non-public nature that is known or used by the Company in connection with the operation of its business, including, its subsidiaries and affiliates, and that Shareholder becomes aware of in his or her capacity as a shareholder in the Company. Confidential Information includes, but is not limited to, information disclosed in writing or orally to the Shareholder and marked or indicated at the time of transmittal to be confidential information.

The Company and the Shareholder hereby agree and warrant that should either of them breach any of their mutual responsibilities as set forth above, including taking any action, or engaging in any conduct, directly or indirectly, that would result in the Company's value being diminished, or that would cause, directly or indirectly, any monetary or any other damages to the Company, then the Company and the Shareholder hereby agree as follows:

     a.      If the violating party is the Company, then the person or persons in the Company who have violated his or her responsibilities as set forth above shall pay monetary damages to the Company in the amount that the Company has lost value, and he or she shall also pay to the Company the amount that the Company has suffered in monetary damages as a result of the violating party's conduct or actions.

     b.      If the violating party is the Shareholder, then the Shareholder who has violated his or her responsibilities as set forth above shall pay monetary damages to the Company in the amount that the Company has lost value, and he or she shall also pay to the Company the amount that the Company has suffered in monetary damages as a result of the violating party's conduct or actions.

**2.**     **Prohibition on Disclosure/Use of Confidential Information.**

The Company and Shareholder acknowledge and agree that the use or disclosure of any Confidential Information could result in irreparable damage to the business and goodwill of the Company. Accordingly, Company and Shareholder agree that they will not, directly or indirectly, disclose, publish, disseminate, or otherwise communicate any Confidential Information of the Company to any third party without the prior written consent of the Company.

Company and Shareholder agree to take all steps as may be necessary to prevent the negligent or inadvertent disclosure of the Company's Confidential Information, and Shareholder will notify the Company immediately of any unauthorized, negligent or inadvertent disclosure of the Company's Confidential Information, and Company will likewise notify Shareholder immediately of any unauthorized, negligent or inadvertent disclosure of the Company's Confidential Information.

**Exceptions.**

Notwithstanding any other provision in this Agreement to the contrary, Shareholder shall have no obligation to maintain in confidence, and shall be free to use or disclose for any and all purposes, any information that:

(1).     was lawfully in Shareholder's possession at the time of disclosure by the Company;

(2)     was at the time of disclosure by the Company, or later became without fault of Shareholder, publicly known;

(3)     is disclosed to Shareholder by a third party that was not, to Shareholder's actual or constructive knowledge, under any legal restrictions as to such disclosure at the time was made;

(4)     was independently developed or acquired by Shareholder or its subsidiaries, affiliates or independent contractors without the use of Confidential Information; or

(5)     is required to be disclosed pursuant to the order of any court or other government or regulatory agency of competent jurisdiction, provided that prior written notice of such disclosure is furnished by Shareholder to the Company as soon as practicable in order to afford the Company an opportunity to seek, at its own expense, a protective order (it being agreed that if the Company is unable to obtain or does not seek a protective order and the Shareholder is legally compelled to disclose such information, disclosure of such information may be made without liability).

3.     **Entire Understanding/Modification.**

This Agreement represents the entire understanding of the parties with respect to its subject matter and may not be modified except in a writing signed by both parties. The recitals above are true and correct and are part of this Agreement.

**4.     Governing Law/Waiver of Jury Trial.**

This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its conflicts of law provisions, in the United States, and the exclusive venue for any action, dispute or proceeding with respect to this Agreement shall be in the state or federal district court of Sacramento County, California, and each of the parties hereby consents, and expressly waives any objections, to jurisdiction and venue including the doctrine of forum non conveniens. The parties specifically waive the right to a jury trial in connection with any dispute arising out of this Agreement, or between the parties for any reason.

**5.     Term.**

This Agreement becomes effective upon the latest date appearing in the signatures below and shall continue in force in perpetuity.

**6.     Shareholder Review.**

Shareholder understands and acknowledges that this Agreement will have important legal consequences and imposes significant responsibilities and requirements on Shareholder. Shareholder acknowledges that he or she has had adequate opportunity to review and to consider the terms and conditions of this Agreement, and to consult with legal counsel of his or her own choosing regarding this Agreement.

**7.     Binding Effect.**

This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

**8.     Severability.**

If a court finds any provision of this Agreement invalid or unenforceable as applied to any circumstance, the other provisions of this Agreement and the same provision as applied to other circumstances will remain in effect to the maximum extent legally permissible.

9.     **Counterparts.**

This Agreement may be executed by facsimile and in counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the date(s) indicated below.

| Government App Solutions, Inc. | Shareholder |
|---|---|
| By: | Signed: |
| Title: CEO | Print Name: Kevin Johnson |
| Date: 1/24/20 | Date: 12.31.19 |

# EXHIBIT B



Gov App Solutions

## COMMON STOCK PURCHASE AGREEMENT

THIS COMMON STOCK PURCHASE AGREEMENT (this "Agreement") is made as of January 24, 2020, by and between Government App Solutions, Inc., a California corporation (the "Company") and **Kevin Johnson**, an individual ("Purchaser").

1.      **Sale of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 100,000 shares / 1% of the Company's Common Stock (the "Shares") at a total purchase price of $100.00. (the "Aggregate Purchase Price"). The Purchaser agrees that the current valuation of the Company is $15,000,000 (Fifteen Million Dollars), and Purchaser acknowledges that Purchaser is receiving the said 100,000 shares herein as a one-time opportunity. The Company will deliver to Purchaser a stock certificate representing the Shares (or the applicable portion thereof) as soon as reasonably practicable thereafter. As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.      **Consideration for Shares.** As consideration for the Shares, Purchaser will deliver the Aggregate Purchase Price by delivering to the Company checks made out to the Company.

3.      **Limitations on Transfer.** Purchaser shall not assign, encumber or dispose of any interest in such Shares except in compliance with the provisions below, any transfer restrictions set forth in the Company's Bylaws, and applicable securities laws.

(a)      **Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 3(a) (the "Right of First Refusal").

(i)      **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's bona fide intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "Transfer Purchase Price"). The Holder shall offer the Shares at the Transfer Purchase Price and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).



Gov App Solutions

(ii)     **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase any or all of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price, provided that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company's Board of Directors. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company's Board of Directors in good faith.

(iii)    **Payment.** Payment of the Transfer Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 60 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(iv)     **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 3(a), then the Holder may sell or otherwise transfer any unpurchased Shares to that Proposed Transferee at the Transfer Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with the transfer restrictions set forth in the Company's Bylaws, if any, and any applicable securities laws, and the Proposed Transferee agrees in writing that the provisions of this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may require the Holder to provide an opinion of counsel evidencing compliance with applicable securities laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(v)      **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3(a) notwithstanding, the transfer of any or all of the Shares during Purchaser's lifetime or on Purchaser's death by will or intestacy to Purchaser's Immediate Family or to a trust for the benefit of Purchaser or Purchaser's Immediate Family shall be exempt from the provisions of this Section 3(a). "Immediate Family" as used in this Agreement shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships, or any person sharing Purchaser's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3.

- 2 -



Gov App Solutions

(b)     **Company's Right to Purchase upon Involuntary Transfer.** In the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer (including divorce or intestate transfer upon death, but excluding transfer upon death by will (to any transferee) or a transfer to Immediate Family as set forth in Section 3(a)(v) above) of all or a portion of the Shares by the record holder thereof, the Company shall have the right to purchase any or all of the Shares transferred at the fair market value of the Shares on the date of transfer (as determined by the Company). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

(c)     **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(d)     **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement, including, insofar as applicable, the Right of First Refusal. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(e)     **Termination of Rights.** The Right of First Refusal granted the Company by Section 3(a) above and the right to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(b) above shall terminate upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(f)     **Lock-up Agreement.** If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.



Gov App Solutions

4. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)     Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b)     Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)     Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d)     Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company or its representatives for any tax advice.

5. **Restrictive Legends and Stop-Transfer Orders.**

(a)     **Legends.** Any stock certificate or, in the case of uncertificated securities, notice of issuance, for the Shares, shall bear the following legend (as well as any legends required by applicable state and federal corporate and securities laws):

(i)     "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ISSUED UNDER THE LIMITED OFFERING EXEMPTION PROVIDED BY SECTION 25102(F) OF THE CALIFORNIA CORPORATIONS CODE."

(ii)     "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

- 4 -



Gov App Solutions

(iii)    "THE SHARES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE SHAREHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(b)    **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)    **Legend and Notice Removal.** When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend specified in Section 5(a)(iii) and the Company will remove any stop-transfer notices associated with the transfer restrictions imposed by this Agreement:

(i)    the termination of the Right of First Refusal; and

(ii)    the expiration or termination of the lock-up provisions of Section 3(f) (and of any agreement entered pursuant to Section 3(f)).

After such time and upon Purchaser's request, a new stock certificate or, in the case of uncertificated securities, notice of issuance, for the remaining Shares, shall be issued without the legend specified in Section 5(a)(iii) and delivered to Purchaser.

6.    **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.    **Certain Defined Terms.**

(a)    "Affiliate" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b)    "Director" means a member of the Board of Directors of the Company.

(c)    "Parent" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other

- 5 -



Gov App Solutions

than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(d)     "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

8.     **Miscellaneous.**

(a)     **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

(b)     **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)     **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)     **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)     **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified



Gov App Solutions

by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(d)     **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(e)     **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(f)     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.

(g)     **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Bylaws by email or any other electronic means, provided Purchaser has executed a Consent to Electronic Delivery of Documents form.

(h)     **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

9.     **Company Valuation.** The company has set the valuation of the company shares at $15,000,000.00 due to receiving its first contract with a government, and anticipated revenue. According to Forbes (https://www.forbes.com/sites/alejandrocremades/2018/03/01/how-to-value-your-company/#7f2a695629d0) companies who generate the anticipated revenue range from $10,000,000 to $40,000,000. By signing this agreement, you agree to the company valuation.



**Gov App Solutions**

*[Signature page follows]*

The parties have executed this Common Stock Purchase Agreement as of the date first set forth above.

**THE COMPANY:**

Government App Solutions, Inc.,

By: _____
(Signature)

Date: January 24, 2020

Name: Gagandeep Johal

Title:   CEO

Address:

980 9th Street, 16th Floor
Sacramento, CA 95814
United States

**PURCHASER:**

**Kevin Johnson**

By: _____
(Signature)

Date: January 25, 2020

Address:
P.O. Box 5448
SACRAMENTO, CA 95817
_____

- 8 -